**John SMITH, Plaintiff,**

v.

**Jessie K. RASMUSSEN, in her Official Capacity as Director of the Iowa Department of Human Services, Defendant.**

No. C97–3055–MWB.

United States District Court,
N.D. Iowa,
Central Division.

July 14, 1999.

Thomas A. Krause of Max and Associates, P.C., Des Moines, IA, for Plaintiff.

Daniel W. Hart, Asst. Iowa Atty. Gen., Gordon E. Allen, Deputy Iowa Atty. Gen., Des Moines, IA, for Defendant.

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND TRIAL ON THE MERITS

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION ........................................................ 740
 A. Initial Findings Of Fact ......................................... 740
 1. Gender identity disorder ................................... 740
 2. Smith's condition ........................................ 743
 B. Procedural Background ......................................... 744

II. LEGAL ANALYSIS ..................................................... 746
 A. Subject Matter Jurisdiction .................................... 746
 1. Arguments of the parties ................................. 746
 2. Justiciability ............................................ 747
 a. Standing ............................................ 749
 i. Constitutional and prudential requirements ........... 749
 ii. Smith's standing ................................... 750
 b. Ripeness ............................................ 751
 i. Constitutional and prudential requirements ........... 751
 ii. Ripeness of Smith's claim .......................... 752
 3. Disposition of the motion to dismiss ...................... 752
 B. The Merits ................................................... 753
 1. The legal basis for Smith's claims ........................ 753
 a. The Director's arguments ............................. 753
 b. Analysis ............................................ 753
 2. Iowa's denial of coverage for sex reassignment surgery ........ 756
 a. The Pinneke decision ................................. 756
 b. Reasonableness of the rule promulgation process ........... 757
 c. Reasonableness of the rule ............................ 760
 i. Medicaid coverage for "experimental" treatments ...... 761
 ii. Defendant's evidence that sex reassignment surgery is experimental .................................... 763
 iii. Other evidence ................................... 769
 3. Is sex reassignment surgery "medically necessary" for Smith? .... 771
 4. Is Smith "ready" for the final stage of sex reassignment surgery? 771

III. CONCLUSION ........................................................ 772

Resolution of this lawsuit is not as simple as deciding whether the plaintiff should be left "betwixt and between" genders as he seeks completion of female-to-male sex reassignment surgery at the expense of the Iowa Medicaid program. Probably nobody familiar with the record in this case would disagree with the observation of plaintiff's treating psychiatrist that being "left in the middle" would be "just a nightmare for anyone." However, the ultimate question before the court is not whether the plaintiff's sex reassignment should be completed, but whether Medicaid should have to pay for it. Before even reaching the merits of that multifaceted question, the court must also determine whether this litigation, like the plaintiff, is caught "betwixt and between," this time somewhere between plaintiff's concerns and a justiciable Article III "case or controversy."

## I. INTRODUCTION

Plaintiff "John Smith"[1] filed this action on May 19, 1997, seeking reimbursement under the Iowa Medicaid program for medically necessary surgical procedures, specifically, female-to-male sex reassignment surgery, as treatment for his gender identity disorder. He[2] originally asserted that denial of Medicaid payments for his sex reassignment surgery was in violation of both Medicaid statutes and regulations and the due process clause of the Fourteenth Amendment to the United States Constitution. He has since withdrawn his due process claim, and at trial asserted only his claim that denial of payments for his sex reassignment surgery was in violation of the Medicaid statutes and regulations. Defendant Jessie K. Rasmussen,[3] in her official capacity as the Director of the Iowa Department of Human Services (the Director),[4] resists Smith's claim for payment for the final stages of his sex reassignment surgery.

### A. Initial Findings Of Fact

What follows is not an exhaustive recitation of the court's findings of fact, but a statement of sufficient of the court's findings and the parties' factual contentions to provide a context for the legal analysis to follow. Because many of the issues that must be resolved in this case involve a complex intertwining of facts and law, pertinent findings of fact are interlaced with identification and application of the proper legal standards for resolution of those issues.

### 1. Gender identity disorder

Plaintiff John Smith suffers from "gender dysphoria" or "gender identity disorder," sometimes known as "transsexualism." "Transsexualism" was in fact a diagnostic category under the criteria found in the third edition of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, the so-called DSM–III–R, but the pertinent diagnosis is now "gender identity disorder." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed.) (DSM–IV). The DSM–IV identifies the general diagnostic features of this gender identity disorder as follows:

> There are two components of Gender Identity Disorder, both of which must be present to make the diagnosis. There must be evidence of a strong and persistent cross-gender identification, which is the desire to be, or the insistence that one is, of the other sex (Criterion A). This cross-gender identification must not merely be a desire for any perceived cultural advantages of being the other sex. There must also be evidence of persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender role of that sex (Criterion B). The diagnosis is not made if

1. "Smith" was granted leave to proceed under a pseudonym by order dated May 19, 1997, and the court directed at that time that any pleading revealing plaintiff's true identity should remain sealed. *See generally Doe v. Hartz,* 52 F.Supp.2d 1027, 1044–48 (N.D.Iowa 1999) (denying leave to prosecute under a pseudonym); *Heather K. v. City of Mallard,* Iowa, 887 F.Supp. 1249, 1255–56 (N.D.Iowa 1995) (granting leave to prosecute under a pseudonym). In the same order, Smith was also granted leave to proceed in this litigation *in forma pauperis.*

2. As a matter of courtesy, the masculine pronoun will be used in reference to the plaintiff throughout this opinion, as it was throughout the trial by all parties. The court appreciates such courtesy from all counsel and witnesses, whatever the legal merits on any issue may be.

3. The defendant was originally Charles Palmer, then Director of the IDHS. However, Ms. Rasmussen has since succeeded Mr. Palmer in that capacity. Therefore, by order dated June 23, 1999, the court recognized that, pursuant to FED.R.CIV.P. 25(d)(1), Jessie K. Rasmussen, in her official capacity as the Director of the IDHS, was automatically substituted as a party defendant in these proceedings.

4. The Iowa Department of Human Services will be referred to herein as "the IDHS" or "the Department."

the individual has a concurrent physical intersex condition (e.g., androgen insensitivity syndrome or congenital adrenal hyperplasia) (Criterion C). To make the diagnosis, there must be evidence of clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion D).

DSM–IV, 532–33.[5]

Gender identity disorder is suffered by people of all ages, although it manifests differently at different ages:

Distress or disability in individuals with Gender Identity Disorder is manifested differently across the life cycle. In young children, distress is manifested by the stated unhappiness about their assigned sex. Preoccupation with cross-gender wishes often interferes with ordinary activities. In older children, failure to develop age-appropriate same-sex peer relationships and skills often leads to isolation and distress, and some children may refuse to attend school because of teasing or pressure to dress in attire stereotypical of their assigned sex. In adolescents and adults, preoccupation with cross-gender wishes often interferes with ordinary activities. Relationship difficulties are common and functioning at school or at work may be impaired.

*Id.* at 534. More particularly, because the plaintiff here is an adult with gender identity disorder, it is pertinent to note the DSM–IV's description of adults with gender identity disorder:

Adults with Gender Identity Disorder are preoccupied with their wish to live as a member of the other sex. This preoccupation may be manifested as an intense desire to adopt the social role of the other sex or to acquire the physical appearance of the other sex through hormonal or surgical manipulation.

5. More specifically, the DSM–IV lists the following diagnostic criteria for gender identity disorder:

A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex).

In children, the disturbance is manifested by four (or more) of the following:

(1) repeatedly stated desire to be, or insistence that he or she is, the other sex

(2) in boys, preference for cross-dressing or simulating female attire; in girls, insistence on wearing only stereotypical masculine clothing

(3) strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex

(4) intense desire to participate in the stereoptypical games and pastimes of the other sex

(5) strong preference for playmates of the other sex

In adolescents and adults, the disturbance is manifested by symptoms such as a stated desire to be the other sex, frequent passing as the other sex, desire to live or be treated as the other sex, or the conviction that he or she has the typical feelings and reactions of the other sex.

B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex.

In children, the disturbance is manifested by any of the following: in boys, assertion that his penis or testes are disgusting or will disappear or assertion that it would be better not to have a penis, or aversion toward rough-and-tumble play and rejection of male stereotypical toys, games, and activities; in girls, rejection of urinating in a sitting position, assertion that she has or will grow a penis, or assertion that she does not want to grow breasts or menstruate, or marked aversion toward normative feminine clothing.

In adolescents and adults, the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

C. The disturbance is not concurrent with a physical intersex condition.

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM–IV, 537–38. The diagnostic code for gender identity disorder for adults in the DSM–IV is 302.85. *Id.*

Adults with this disorder are uncomfortable being regarded by others as, or functioning in society as, a member of their designated sex. To varying degrees, they adopt the behavior, dress, and mannerisms of the other sex. In private, these individuals may spend much time cross-dressed and working on the appearance of being the other sex. Many attempt to pass in public as the other sex. With cross-dressing and hormonal treatments (and for males, electrolysis), many individuals with this disorder may pass convincingly as the other sex. The sexual activity of these individuals with same-sex partners is generally constrained by the preference that their partners neither see nor touch their genitals. For some males who present later in life, (often following marriage), sexual activity with a woman is accompanied by the fantasy of being lesbian lovers or that his partner is a man and he is a woman.

*Id.* at 533–34.

The Harry Benjamin International Gender Dysphoria Association, Inc., often called the "Harry Benjamin Society," is a professional organization for persons involved in the diagnosis and treatment of gender identity disorder and related conditions. It is named after the first person to describe the syndrome, and the results of recent research into the nature or treatment of the condition are often first presented at its meetings. The Harry Benjamin Society has drafted the recognized standards of care for the hormonal and surgical sex reassignment of gender dysphoric persons. *See* HARRY NJAMIN INTERNATIONAL GENDER DYSPHORIA ASSOCIATION, INC., STANDARDS OF CARE: THE HORMONAL AND SURGICAL SEX REASSIGNMENT OF GENDER DYSPHORIC PERSONS (Rev.1990) (hereinafter "HARRY BENJAMIN STANDARDS"). In these standards, hormonal sex reassignment is defined as follows:

Hormonal sex reassignment refers to the administration of androgens to genotypic and phenotypic females, and the administration of estrogens and/or progesterones to genotypic and phenotypic males, for the purpose of effecting somatic changes in order for the patient to more closely approximate the physical appearance of the genotypically other sex. Hormonal sex-reassignment does not refer to the administration of hormones for the purpose of medical care and/or research conducted for the treatment or study of non-gender dysphoric medical conditions (e.g., aplastic anemia, impotence, cancer, etc.).

HARRY BENJAMIN STANDARDS, 3.2. The HARRY BENJAMIN STANDARDS also define surgical sex reassignment as follows:

Genital surgical sex reassignment refers to surgery of the genitalia and/or breasts performed for the purpose of altering the morphology in order to approximate the physical appearance of the genetically-other sex in persons diagnosed as gender dysphoric. Such surgical procedures as mastectomy, reduction mammoplasty, augmentation mammoplasty, castration, orchidectomy, penectomy, vaginoplasty, hysterectomy, salpingectomy, vaginectomy, oophorectomy and phalloplasty—in the absence of any diagnosable birth defect or other medically defined pathology, except gender dysphoria, are included in this category labeled surgical sex reassignment.

Non-genital surgical sex reassignment refers to any and all other surgical procedures of non-genital, or non-breast sites (nose, throat, chin, cheeks, hips, etc.) conducted for the purpose of effecting a more masculine appearance in a genetic female or for the purpose of effecting a more feminine appearance in a genetic male, in the absence of identifiable pathology which would warrant such surgery regardless of the patient's genetic sex (facial injuries, hermaphroditism, etc.).

*Id.* at 3.3. The DSM–IV indicates further that, based on data from smaller countries in Europe with access to total population statistics and referrals, "roughly 1 per 30,-

000 adult males and 1 per 100,000 adult females seek sex-reassignment surgery" for gender identity disorder. *Id.* at 535. Undocumented estimates are that between 30,000 and 60,000 United States citizens consider themselves to be valid candidates for sex reassignment, and that 3,000 to 6,000 Americans had been hormonally and surgically sex-reassigned as of 1979. HARRY BENJAMIN STANDARDS, at 1. The HARRY BENJAMIN STANDARDS also state qualifications for persons who can recommend sex reassignment surgery and hormone therapy, and principles for determining when sex reassignment surgery should be recommended. HARRY BENJAMIN STANDARDS, *passim.*

### 2. Smith's condition

Smith was born female, but is now medically and legally classified as male. Smith grew up with adoptive parents from the time he was approximately two months old. He is now thirty-nine years old. He claims to be of at least one-eighth Native American extraction, which is something he says he always suspected, but was only able to confirm after his petition to open his adoption records was granted during his adulthood and he was able to talk to his birth mother. He is now an adherent of the Oglala religion or spirituality, which is practiced, for example, by the Lakota Sioux of the Pine Ridge, Rosebud, and Cheyenne River Reservations in North and South Dakota.

To all outward appearances, Smith is male, and has, for example, found it difficult or impossible to use the women's restroom in public places, and indeed he has consistently chosen to use the men's room. He has always believed himself to be male, even to the point of refusing to wear dresses from as young as four years old, the age at which he testified that he was old enough to "fight them off" when his parents attempted to put "girls'" clothes on him. Since his early youth, Smith has consistently adopted "male" attire. Smith can only remember willingly wearing female clothing on very few occasions: At his parents' request, he wore a dress for high school graduation and, also at his parents' request, he wore a dress for his older sister's wedding. However, Smith discontinued participation in high school choir when school officials demanded that he wear dresses for performances. Smith habitually played "boys'" games and was interested and involved in typically male activities. As a consequence of his perception that he was male, puberty was a "tumultuous" time for Smith, as his body—despite his fervent hopes—developed female secondary sex characteristics.

Smith has suffered from depression since early in his youth, and he has a longstanding diagnosis of suffering from depression. In addition, he was involved in a car accident in 1978 that injured his larynx and permanently affected his speech, despite corrective and reconstructive surgery. Smith also has a brain stem or closed-head injury from that accident, which has affected his memory and has been a cause of some of his behavior, such as hallucinations and hearing voices, that has from time to time been labeled as a psychiatric or psychotic phenomenon. Many of these supposedly psychotic phenomena, however, are in fact consistent with visions, which are part of his Oglala spirituality; other supposedly psychotic episodes are attributable to negative reactions to medications prescribed in attempts to treat his psychiatric conditions. However, there is no record of recent "psychotic" episodes, either religious visions, medication-related hallucinations, or symptoms of a mental condition.

As a result of the settlement of a lawsuit arising from the car accident in 1978, Smith receives just over $500 per month from an annuity out of which he pays his living expenses. Smith is unable to work as the result of disabilities from his car accident and receives Iowa Medicaid assistance as a "medically needy" individual. Despite his disabilities, Smith obtained a B.A. degree in clinical psychology in 1982

and a M.A. degree in the same discipline in 1993.

Smith had a hysterectomy with removal of one ovary in late 1992, which he concedes was only partly in furtherance of his sex reassignment. Other reasons for that surgery included his suffering from endometriosis, fibrocystic breast disease, and dysmenorrhea. Iowa Title XIX Medicaid benefits paid for Smith's 1992 surgery. Medicaid also paid for a second surgery to remove Smith's second ovary somewhat later, after he developed the same abdominal pain that had prompted the first surgery. On February 20, 1997, Smith had bilateral breast reduction and male chest contouring, which he considered to be part of his sex reassignment surgery, although medical conditions also provided some justification for the breast reduction. Smith sought payment for the 1997 surgery from Medicaid, but Medicaid denied the claim on the ground that the procedure constituted sex reassignment surgery not covered by Medicaid benefits. Smith therefore paid for this portion of his sex reassignment surgery himself. He is very satisfied with the results of all of these surgeries to date from the standpoint of sex reassignment. The remaining surgical portion of Smith's sex reassignment would be a phalloplasty, or surgical construction of a new penis. It is who will pay for this final stage of his sex reassignment surgery that is at issue in this lawsuit.

Prior to seeking Medicaid payment for the final stage of his sex reassignment surgery, Smith underwent psychotherapy, for both gender identity issues and other conditions, such as diagnoses for atypical bipolar disorder and depression. He has also attempted pharmacological treatment of his psychiatric conditions, with at best mixed results. As another part of his preparation for sex reassignment, Smith began receiving male hormone treatment, including intramuscular injection of testosterone, in January of 1997. Smith has also completed a "real life test," which required him to live in his desired gender role for a significant period of time.[6] Smith has in fact lived as a male for many years and has passed as a male in public at all times for many years. Smith explains his desire to complete surgical sex reassignment—in addition to simply living as a male—as based on his belief that his gender identity or sexual identity is a major component of who he is as a person, how he feels, thinks, behaves, and reacts. In short, Smith's gender is "fundamental" to his identity. Completion of a phalloplasty, Smith states, and the court finds, will allow him to lead something approaching a more "normal life," fulfilling his "need to be whole." Practical problems he encounters lacking such surgery are in dating, using public restrooms, and otherwise passing for male in private or enclosed areas.

Assuming it is appropriate to turn to the merits, over the assertion of a lack of subject matter jurisdiction by the Director of the IDHS, among the key questions the court will consider in more detail in the course of its legal analysis—and questions highlighting the interwoven nature of the factual and legal issues in this case—are whether sex reassignment surgery is an appropriate and "medically necessary" treatment for Smith's gender identity disorder, and whether Smith is indeed "ready" for such final and irreversible treatment.

### B. Procedural Background

As mentioned above, Smith filed the present lawsuit on May 19, 1997, and was granted leave to prosecute the action *in forma pauperis* and under a pseudonym. Also as explained above, the original com-

---

6. Standard 9 of the HARRY BENJAMIN STANDARDS specifically requires such a "real life" test prior to sex reassignment surgery:

Standard 9. Genital sex reassignment shall be preceded by a period of at least 12 months during which time the patient lives full-time in the social role of the genetically other sex.

HARRY BENJAMIN STANDARDS, 4.91.

plaint asserted two claims: In Count I, Smith alleged that the denial of sex reassignment surgery violates the federal Medicaid statute and its attendant regulations; in Count II, Smith alleged that the denial of sex reassignment surgery violates his right to due process under the Fourteenth Amendment to the United States Constitution.

The defendant Director of the IDHS answered the complaint on June 18, 1997, and subsequently moved for summary judgment almost a year later on June 1, 1998. This court denied the Director's motion for summary judgment, concluding as follows:

> Initially, because the court concludes that 42 U.S.C. § 1396a(a)(17) creates a federal right, which is further defined in 42 C.F.R. § 440.230(b), that is sufficiently definite to be enforced under § 1983 and because Congress did not intend to foreclose private enforcement of the Medicaid statute, plaintiff Smith states a cause of action under § 1983 for violation of § 1396a(a)(17). The court also concludes that plaintiff Smith has generated a material question of fact as to whether sex reassignment surgery is a medically necessary treatment for plaintiff Smith's gender dysphoria. Finally, the court concludes that plaintiff Smith has generated a genuine issue of material fact as to whether the Iowa Department of Human Services' reliance on the Iowa Foundation For Medical Care's report [to exclude Medicaid coverage for sex reassignment surgery] was a reasonable exercise of discretion. Therefore, defendant Palmer's Motion For Summary Judgment is **denied.**

*Smith v. Palmer*, 24 F.Supp.2d 955, 968 (N.D.Iowa 1998). In a trial brief, the Director of the IDHS asks the court to revisit these conclusions in the course of making a determination on the merits of Smith's claim.

On December 14, 1998, just before trial, Smith was granted leave to file an amended complaint. His amended complaint identified more specifically 42 U.S.C. § 1396a(a)(17) as the statutory basis for his claim in Count I and deleted entirely the due process claim in Count II. This court held a bench trial on Smith's remaining claim beginning on December 16, 1998, and concluding on December 18, 1998. During the course of trial, questions were raised about the court's subject matter jurisdiction. The Director of the IDHS formalized those concerns with a motion to dismiss on December 30, 1998, challenging the justiciability of Smith's claim on the ground that Smith has failed to show that he is presently eligible for sex reassignment surgery or that sex reassignment surgery has been recommended by his treating physicians. Thus, the Director of the IDHS contends that there is no "ripe" Article III case or controversy.

Post-trial briefing ensued on the question of the "ripeness" of Smith's claim. After resisting the motion to dismiss by the Director of the IDHS on January 15, 1999, Smith attempted to file two supplemental memoranda in support of his resistance on January 21, 1999, and January 25, 1999, respectively. The first supplemental memorandum included a letter dated January 14, 1999, from Smith's treating psychiatrist and trial expert, Dr. Satterfield, including her recommendation that Smith is now ready for sex reassignment surgery. The second supplemental memorandum included a letter from Dr. Robiner, one of Smith's treating psychologists who was not a witness at trial, also certifying that Smith is now ready for sex reassignment surgery. The court granted Smith's motion to file the first supplemental memorandum, to which the Director of the IDHS subsequently objected. The Director also objected to the filing of the second supplemental memorandum, and sought leave, if the second supplemental memorandum was accepted by the court, to conduct additional discovery and to have an opportunity to name an additional expert to respond to Dr. Robiner's testimony.

By order dated February 8, 1999, this court denied Smith's second motion to file

a supplemental memorandum, denied the Director's motion for additional discovery and to designate a new expert as moot, and granted the Director's motion to reconsider the order granting Smith leave to file his first supplemental memorandum on certain conditions. Specifically, the court established a schedule for supplemental depositions, first, of Smith's expert, Dr. Satterfield, concerning her new opinions as reflected in her letter accompanying the first supplemental memorandum, and, second, of the Director's trial expert, Dr. Kavalier, in order to allow him to respond to Dr. Satterfield's new opinions. After an extension of time to take the supplemental deposition of Dr. Kavalier, the depositions of both experts were submitted as supplements to the trial record in April of 1999.

The court heard oral arguments on the Director's motion to dismiss and final arguments on trial on the merits on June 23, 1999. Plaintiff John Smith was represented by Thomas A. Krause of Max Schott and Associates, P.C., in Des Moines, Iowa. Defendant Jessie K. Rasmussen, in her official capacity as Director of the Iowa Department of Human Services, was represented by counsel Daniel W. Hart, Assistant Iowa Attorney General, and Gordon E. Allen, Deputy Iowa Attorney General, in Des Moines, Iowa. Although the issues have been joined zealously, and the case is clearly hard fought, the court has been impressed with the courtesy with which all counsel have conducted the trial and arguments before the court. The court has also been impressed by the quality and thoroughness of the briefing of the various complicated issues this case has presented.

The court finds that both the Director's motion to dismiss for lack of subject matter jurisdiction and trial on the merits are now fully submitted and ripe for resolution.

## II. LEGAL ANALYSIS

### (Including some further findings of fact)

The court will begin its legal analysis with the question last raised by the Director: Does the court have subject matter jurisdiction to entertain Smith's claim at all? If subject matter jurisdiction is lacking, the court would have no authority to pass on the merits of Smith's claim, except to the extent that the question of the "ripeness" of Smith's claim is necessarily intertwined with the merits, that is, to the extent both questions in part depend upon whether Smith is "ready" for sex reassignment surgery. Nonetheless, a conclusion that Smith is "ready" for sex reassignment surgery, and therefore has presented a ripe "case or controversy," does not necessarily answer the question of whether the treatment for which he is "ready" is also "medically necessary" within the meaning of the Medicaid statute.

### A. Subject Matter Jurisdiction

### 1. Arguments of the parties

In a post-trial motion to dismiss for lack of subject matter jurisdiction, the Director asserts that Smith lacks standing to assert his claim and that even if he has standing, his claim is not "ripe." The Director asserts that Smith is impermissibly requesting an advisory opinion that, if and when his own medical professional is willing to state that his desired surgery is medically necessary, Medicaid will be obligated to provide funding, but those future events are uncertain, contingent, may not occur as anticipated, or may never occur. In short, the Director asserts Smith's claim is entirely hypothetical. Furthermore, the Director asserts that Smith will suffer no hardship from denial of a judicial decision on his claim until and unless he receives a medical opinion that he is ready for sex reassignment surgery. The Director objects to any delay in dismissal of Smith's claim that might allow jurisdiction to attach.

In a resistance to the motion to dismiss filed prior to the date of Dr. Satterfield's letter certifying that Smith is now "ready"

for completion of sex reassignment surgery, Smith argued that his need for sex reassignment was sufficiently real and immediate at the time of trial to satisfy the requirements of standing and ripeness. He argued that his claim for a phalloplasty satisfied both constitutional and prudential requirements, because he has steadfastly pursued such surgery and has presented his claim in truly adversarial proceedings challenging a firmly established policy of the IDHS to deny Medicaid benefits for sex reassignment surgery. He also pointed out that sex reassignment is a multistage process and that he has completed all but the last stage, so that he is "in the middle" of the procedure, while asserting a claim for Medicaid coverage of the final stage. He argued that failure of the court to address his claim now would impose a severe hardship as completion of more legal proceedings to obtain the procedure would likely take several years, rather than the months before he would most certainly be ready for the surgery. He also argued that no further factual development of the record was required. In his supplemental brief, Smith presented the letter of Dr. Satterfield as establishing that he is now indeed "ready" for final sex reassignment surgery. He argues on the basis of this additional evidence that any questions about the immediacy of his claim have disappeared.

As an alternative to this principal dispute over the ripeness of Smith's claim for Medicaid coverage of his phalloplasty, Smith also asserted that his claim for reimbursement for breast reduction surgery was clearly ripe, because Medicaid had already denied coverage for that claim. In a reply brief, the Director argued that no such claim for reimbursement for the breast reduction surgery had ever been asserted either prior to or during trial. As the court pointed out at the end of trial, when the parties first addressed the question of subject matter jurisdiction, the only claim asserted in a timely fashion in this litigation is a claim for Medicaid payment for Smith's phalloplasty. Therefore, neither jurisdiction nor relief will depend upon a claim for reimbursement for breast reduction surgery, as such a claim is not properly before the court.

### 2. Justiciability

The federal district courts have always been courts of limited jurisdiction. *See* U.S. CONST., Art. III, § 1. "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equip. Management Co. v. United States,* 4 F.3d 643, 646 (8th Cir.1993) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), citing in turn *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803)); *see also Mausolf v. Babbitt,* 85 F.3d 1295, 1300 (8th Cir.1996) (Article III limits the "judicial power" to "cases" and "controversies," citing U.S. CONST., Art. III, § 2, cl. 1), *Neighborhood Transp. Network, Inc. v. Pena,* 42 F.3d 1169, 1171 (8th Cir.1994) (federal court jurisdiction is limited by Article III of the Constitution).

"The existence of a live case or controversy is a constitutional prerequisite to the jurisdiction of the federal courts." *In re Grand Jury Subpoenas Duces Tecum,* 78 F.3d 1307, 1310 (8th Cir.), *cert. denied sub nom. Branscum v. United States,* 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 331 (1996), *and cert. denied sub nom. Hill v. United States,* 519 U.S. 981, 117 S.Ct. 432, 136 L.Ed.2d 331 (1996); *see also Von Eye v. United States,* 92 F.3d 681, 684 (8th Cir.1996) (quoting *In re Grand Jury Subpoenas* ). "From this bedrock requirement [of a case or controversy] flow several doctrines—*e.g.,* standing, mootness, ripeness, and political question—which state fundamental limits on federal judicial power in our system of government." *Mausolf,* 85 F.3d at 1300 (internal quotation marks and citations omitted).

■ Two of the doctrines going to the "justiciability" of Smith's claim are at issue here, "ripeness" and "standing." Although the doctrines of "ripeness" and "standing" are "technically different," "they are closely related in that each focuses on 'whether the harm asserted has matured sufficiently to warrant judicial intervention.'" *Johnson v. Missouri*, 142 F.3d 1087, 1090 n. 4 (8th Cir.1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Both doctrines have constitutional and prudential dimensions. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *McKenzie v. City of White Hall*, 112 F.3d 313, 316 (8th Cir. 1997) (to show that claims are "ripe," the claimant must show both a constitutionally adequate "case or controversy" and that prudential considerations justify the exercise of judicial power).

■ This court has explained that a federal court is charged with examining its jurisdiction at every step of the litigation. *See Morris v. Winnebago Indus., Inc.*, 936 F.Supp. 1509, 1530 (N.D.Iowa 1996) (federal courts are courts of limited jurisdiction and must assure themselves that they have subject matter jurisdiction over claims before them at all stages of the proceedings, even if the parties do not raise the question of subject matter jurisdiction themselves, citing *McCorkindale v. American Home Assur. Co.*, 909 F.Supp. 646, 649 n. 4 (N.D.Iowa 1995), and *Laird v. Ramirez*, 884 F.Supp. 1265, 1269–70 (N.D.Iowa 1995)). The Director specifically asserts that subject matter jurisdiction was missing at a critical step in this litigation, because this matter was neither ripe nor did Smith have standing to assert it at the time of trial, because Smith had not been certified as "ready" for the final stages of his sex reassignment surgery. The Di-

rector contends that Dr. Satterfield's subsequent certification that Smith is now "ready" for completion of his sex reassignment surgery cannot rectify the lack of subject matter jurisdiction at the time of trial. Smith counters that *Anderson v. Green*, 513 U.S. 557, 115 S.Ct. 1059, 130 L.Ed.2d 1050 (1995), stands for the proposition that standing and ripeness requirements are considered in the situation at the time a decision is rendered.

The court cannot read *Anderson* as broadly as Smith does. In *Anderson*, the Court was asked to consider a challenge by new residents of California to a statute of that state limiting for one year the AFDC benefits of such new residents to the level of benefits in the state from which they came. *See Anderson*, 513 U.S. at 558–59, 115 S.Ct. 1059. The Court found that California could only provide AFDC benefits with such a differential between new and long-time residents if it had in place a waiver from the Secretary of Health and Human Services (HHS). *Id.* at 559, 115 S.Ct. 1059. Although HHS had originally granted California such a waiver, the court of appeals below had vacated the HHS waiver in a separate proceeding prior to the case wending its way before the Court on certiorari. *Id.* In these circumstances, the Court found that at the time the matter was before it for decision, California could not treat the new residents any differently than it was treating long-time residents, and consequently no "ripe" controversy was then before the Court. *Id.* It is in this context that the Court used the language upon which Smith relies—language that, taken literally, might support his argument—that "'ripeness is peculiarly a question of timing,' and 'it is the situation now rather than the situation at the time of the [decision under review] that must govern.'" *Id.* (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)). The quoted language, read in context, stands for no more than the unremarkable proposition that a case must remain justiciable at the time a decision is

rendered; it does not stand for the proposition that if a case becomes justiciable only between trial and entry of judgment, the justiciability somehow "relates back" to the time of trial, rectifying a lack of subject matter jurisdiction at the time of trial.

The court can find no other authority persuasively supporting Smith's contention that the court can ignore a lack of subject matter jurisdiction prior to its entry of judgment if subject matter jurisdiction has somehow attached between trial and the entry of that judgment. However, as the court will explain more fully below, the court finds that subject matter jurisdiction existed at the time the complaint in this matter was filed, existed at the time of trial, and continues to exist at this time.

### a. Standing

■ **i. Constitutional and prudential requirements.** "Standing is a threshold matter that, if absent, prevents [a] Court from exercising jurisdiction." *Campbell v. Minneapolis Pub. Hous. Auth.*, 168 F.3d 1069, 1073 (8th Cir.1999). "The Supreme Court has often emphasized that a lawsuit in federal court is not a forum for the airing of interested onlookers' concerns, nor an arena for public-policy debates." *Mausolf*, 85 F.3d at 1301 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Instead, the court must find that the litigant has standing before it may reach the merits of his or her claim. *Campbell*, 168 F.3d at 1073.

■ As the Eighth Circuit Court of Appeals explained in *Campbell*,

The Constitution requires a party to satisfy three elements before it has standing to bring suit in federal court: injury in fact, causation, and redressability. *See [Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, ——, 118 S.Ct. 1003,] 1016–17 [140 L.Ed.2d 210 (1998)] [ (1998) ].[T]he party invoking federal jurisdiction[ ] has the burden of estab-

lishing these three elements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

*Campbell*, 168 F.3d at 1073; *accord Olympus Aluminum Prods., Inc. v. Kehm Enters., Ltd.*, 930 F.Supp. 1295, 1306 (N.D.Iowa 1996). A somewhat more detailed explanation of these constitutional requirements was set forth in *Mausolf v. Babbitt*, 85 F.3d 1295 (8th Cir.1996):

First, the would-be litigant must have suffered an "injury in fact"; that is, an "invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical...." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (internal quotation marks and citations omitted). Second, the would-be litigant must establish a causal connection between the alleged injury and the conduct being challenged. *Ibid*. Third, he must show that the injury is likely to be redressed by a favorable decision. *Id*. at 561, 112 S.Ct. at 2137; *see Friends of the Boundary Waters Wilderness v. Thomas*, 53 F.3d 881, 886 (8th Cir.1995) (standing requires (1) injury in fact, (2) causation, and (3) redressability).

*Mausolf*, 85 F.3d at 1301.

■ The prudential requirement of standing involves satisfaction of the "zone-of-interests test." *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1125 (8th Cir.1999). This zone-of-interests test "considers whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id*. (quoting *Bennett*, 520 U.S. at 163, 117 S.Ct. 1154, in turn quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)) (internal quotation marks omitted). More specifically, " '[w]hether a plaintiff's interest is arguably protected by the statute within the meaning of the zone-of-interests test is

to be determined not by reference to the overall purpose of the Act in question ... but by reference to the particular provision of law upon which the plaintiff relies.'" *Id.* (quoting *Bennett,* 520 U.S. at 175–76, 117 S.Ct. 1154, with alterations and quotations omitted).

*ii. Smith's standing.* The court concludes that Smith satisfies the initial three-prong test of standing, and indeed satisfied it at the time his complaint was filed through the time of trial. As to his "injury in fact," *Campbell,* 168 F.3d at 1073; *Mausolf,* 85 F.3d at 1301, the court finds first that Smith has suffered an "invasion of a legally protected interest which is ... concrete and particularized," *Mausolf,* 85 F.3d at 1301, in that, as a recipient of Medicaid assistance, he has a legally protected interest in receiving coverage pursuant to "reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan." 42 U.S.C. § 1396a(a)(17). That interest here is "concrete and particularized," *Mausolf,* 85 F.3d at 1301, because Smith seeks coverage for a specific treatment. Furthermore, the invasion of the interest is "actual or imminent, not conjectural or hypothetical," *id.,* because Smith is *in the middle,* indeed near the end, of the sex reassignment process, having already undergone several stages of the process—including a hysterectomy and removal of his ovaries, breast reduction, hormone treatment, "real life" test, and psychotherapy—and coverage has already been denied for some of those previous steps in the process. In short, this is not a situation in which the plaintiff's desire for Medicaid coverage for a specific treatment has appeared out of the blue and there is some hypothetical or contingent element to the demand; rather, Smith seeks coverage to *complete a process that has been going forward for years,* even if the exact timing of the final phase of treatment were somehow uncertain— which, according to Dr. Satterfield's supplemental testimony, it should not now be. Although Smith cannot assert a claim for reimbursement for prior stages of sex reassignment surgery in this litigation— because he has not made such a claim here—in the context of a continuing process of sex reassignment for which some prior claims for reimbursement have already been denied, and in the absence of any indication that the IDHS will change its policy of denying such claims, the court finds that Smith's injury is certainly *"imminent,* not conjectural or hypothetical." *Id.* (emphasis added).

As to the second prong of the test for standing, Smith can show "causation," *Campbell,* 168 F.3d at 1073; *Mausolf,* 85 F.3d at 1301, in that the challenged conduct is the defendant's denial of coverage for the final stage of Smith's sex reassignment surgery, and the injury causally connected to that conduct is that Smith is denied completion of the surgery, a purportedly medically necessary treatment for his condition. Third, Smith can show that a favorable decision is likely to "redress" his injury, *id.; Mausolf,* 85 F.3d at 1301, because the decision will remove the final impediment to his obtaining the final stage of his sex reassignment surgery.

Thus, the remaining issue for determining Smith's standing to pursue this litigation is the prudential one of whether he satisfies the "zone-of-interest test." *See Friends of Boundary Waters Wilderness,* 164 F.3d at 1125. The court finds that the interest Smith seeks to protect is at least arguably within the zone of interests to be protected or regulated by 42 U.S.C. § 1396a(a)(17). *Id.* Although Donald Herman, the Administrator of the Division of Medical Services for the IDHS, testified that he perceived the purpose of the Iowa Medicaid program to be to provide the broadest package of benefits available to the most people possible with the resources available, Trial Transcr., Testimony of Donald Herman, Vol. II, p. 367, ll. 4– 8, whether Smith's interest satisfies the zone-of-interests test " 'is to be determined not by reference to the overall purpose of the Act in question ... but by reference to

the particular provision of law upon which the plaintiff relies.'" *Id.* (quoting *Bennett,* 520 U.S. at 175–76, 117 S.Ct. 1154, with alterations and quotations omitted). The interest of the particular provision here, 42 U.S.C. § 1396a(a)(17), as this court explained in its ruling on summary judgment, is to impose "reasonable standards" for determining eligibility for and the extent of medical assistance consistent with the objective of Medicaid to provide medical services to the needy, the aged, the blind, and the disabled. *See Smith,* 24 F.Supp.2d at 963; 42 U.S.C. § 1396a(a)(17) (stating that the "reasonable standards" must be "consistent with the objectives of this subchapter" and take into account income eligibility requirements); *see also Hern v. Beye,* 57 F.3d 906, 910–11 (10th Cir.) ("Second, Colorado's restriction violates 42 U.S.C. § 1396a(a)(17) because it is inconsistent with the basic objective of Title XIX—to provide qualified individuals with medically necessary care."), *cert. denied sub nom. Weil v. Hern,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 494 (1995). Smith's interest in completion of his sex reassignment surgery falls within this "zone of interests," because he asserts he is being unreasonably denied coverage for sex reassignment surgery even though he falls within the group of persons Medicaid is designed to protect and the treatment sought is medically necessary and consistent with the medical assistance otherwise provided.

Therefore, Smith has "standing" to pursue his claims here.

### b. Ripeness

#### i. Constitutional and prudential requirements.

Both the Eighth Circuit Court of Appeals and the United States Supreme Court have explained that

[t]he basic rationale of the ripeness doctrine is to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an ad-

ministrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*California v. FCC,* 124 F.3d 934, 943 (8th Cir.1997) (quoting *Missouri v. Cuffley,* 112 F.3d 1332, 1337 (8th Cir.1997), with internal quotations and citations omitted), *rev'd in part on other grounds, AT&T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999); *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, ——, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998) (*quoting Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *see also Southwestern Bell Tel. Co. v. FCC,* 153 F.3d 523, 556 (8th Cir.1998) (quoting *California v. FCC* ).

To show that claims are "ripe" for federal judicial determination, a plaintiff must show two things: (1) that there is a sufficiently concrete case or controversy within the meaning of Article III of the Constitution; and (2) that prudential considerations justify the present exertion of federal judicial power. *See McKenzie v. City of White Hall,* 112 F.3d 313, 316 (8th Cir.1997); *Von Eye v. United States,* 92 F.3d 681, 684 (8th Cir.1996) (same); *accord Ohio Forestry Ass'n, Inc.,* 523 U.S. at ——, 118 S.Ct. at 1670 (describing the two requirements as a showing of the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration," citing *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507); *Texas v. United States,* 523 U.S. 296, ——, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998) (citing the same factors as the Court in *Ohio Forestry Ass'n* ). The first requirement is satisfied if "the 'conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Cuffley,* 112 F.3d at 1337 (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), in turn quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93,

65 S.Ct. 1483, 89 L.Ed. 2072 (1945)). The second requirement involves consideration of "the 'hardship to the parties of withholding court consideration.' " *Ohio Forestry Ass'n, Inc.*, 523 U.S. at ——, 118 S.Ct. at 1670; *Texas v. United States*, 523 U.S. at ——, 118 S.Ct. at 1260. Some of the specific factors the Supreme Court has required courts to consider in determining whether the requirements of "ripeness" have been met are the following:

> (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Ohio Forestry Ass'n, Inc.*, 523 U.S. at ——, 118 S.Ct. at 1670. In another recent decision, the Supreme Court noted that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, ——, 118 S.Ct. 1257, 1259, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), in turn quoting 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3532, p. 112 (1984)) (internal quotation marks omitted).

■ *ii. Ripeness of Smith's claim.* For many of the same reasons the court found that Smith has standing to pursue his claim, the court finds that he has satisfied the first prong of the "ripeness" determination, a concrete case or controversy within the meaning of Article III of the Constitution. *See McKenzie*, 112 F.3d at 316. The conflicting contentions of Smith and the Director regarding coverage of sex reassignment surgery present a "real, substantial controversy between the parties having adverse legal interests," and that dispute is "definite and concrete, not hypothetical or abstract," *Cuffley*, 112 F.3d at 1337, again, because Smith is in the middle or near the end of an on-going, multi-stage process of sex reassignment, the defendant has already denied coverage for prior stages of the process, and the defendant shows no sign of changing Iowa Medicaid policy to deny coverage for sex reassignment surgery.

Prudential considerations also weigh in favor of finding that the present dispute is "ripe," because delay would cause hardship to Smith, in that it would delay the final stage of sex reassignment surgery for which he was imminently or is now "ready"; judicial intervention would not inappropriately interfere with further administrative action, because there is no indication that the IDHS currently or ever intends to revisit its regulations prohibiting coverage for sex reassignment surgery; and the factual development of the issues after trial on the merits is more than adequate to address the issues, so that no further factual development is required. *See Ohio Forestry Ass'n, Inc.*, 523 U.S. at ——, 118 S.Ct. at 1670 (requiring consideration of these factors). Although the Director asserted that this case is not ripe for adjudication, because it rests upon contingent future events that may not occur as anticipated, or may never occur, *see Texas v. United States*, 523 U.S. at ——, 118 S.Ct. at 1259, because Smith's physicians had not certified him as "ready" for the final stage of sex reassignment surgery at the time of trial, that defect has evaporated with Dr. Satterfield's supplemental certification that Smith is indeed now "ready" for a phalloplasty.

Therefore, the court finds that this matter is "ripe" for adjudication.

### 3. Disposition of the motion to dismiss

Thus, the court finds that Smith now has—and had throughout this litigation—"standing" to pursue the claim presented here, and that his claim is—and has been—"ripe" for adjudication. Because the "bedrock requirement" of a case or controversy—upon which the Director's

standing and ripeness challenges were based—has been satisfied, *see Mausolf,* 85 F.3d at 1300 ("From this bedrock requirement [of a case or controversy] flow several doctrines—*e.g.,* standing, mootness, ripeness, and political question—which state fundamental limits on federal judicial power in our system of government.") (internal quotation marks and citations omitted), the Director's motion to dismiss for lack of subject matter jurisdiction will be denied. The court will therefore turn to the merits of Smith's claim for coverage by the Iowa Medicaid program of the final stage of his sex reassignment surgery.

### B. The Merits

In asserting that Smith is not entitled to relief on the merits, the Director first asks the court to reconsider its ruling on summary judgment, which determined that there was a legal basis for Smith's claims and that there were genuine issues of material fact on the proof of those claims. In addition, the Director's counsel declared succinctly his position at trial that the defense would prove that sex reassignment surgery is very far from an accepted medical procedure and very far from anything that the state Medicaid program ought to provide. Smith argues that there is indeed a legal basis for his claims, and that sex reassignment surgery is not "experimental," but a recognized treatment for his gender identity disorder, that it is "medically necessary" for his condition, and that he is now "ready" for such surgery.

### 1. The legal basis for Smith's claims
#### a. The Director's arguments

 In his trial brief, the Director asserted that the court should reconsider its conclusions, rendered in the order denying the Director's motion for summary judgment, that Smith has a cause of action under 42 U.S.C. § 1983 based on rights defined in 42 U.S.C. § 1396a(a)(17) and 42 C.F.R. § 440.230(b), (c) and (d). The Director reiterates the argument that the "extent" of medical assistance discussed in § 1396a(a)(17) refers to the "extent" of the *assistance,* that is, to deductibles and coverage limits, not to the scope of services covered by a state plan. To the extent the statute has been interpreted to refer to services provided, the Director contends the statute provides no judicially enforceable standard, particularly when viewed in conjunction with the purpose of Title XIX to render coverage "as far as practicable under the conditions in such state." 42 U.S.C. § 1396. The Director also reiterates the argument that 42 C.F.R. § 440.230(b) does not further define any right to services under § 1396a(a)(17), because it does not purport to implement that subsection of the statute, but instead implements § 1396a(a)(10), citing 42 C.F.R. § 440.200(a)(1). He argues further that 42 C.F.R. § 440.230(b) does not address what services are provided, only the amount, duration, and scope of the services the state has decided to provide to persons in the medically needy category. The Director also argues that sex reassignment surgery is not a service that must be provided to medically needy individuals under 42 C.F.R. § 440.230(c) and § 440.220, and that 42 C.F.R. § 440.230(c) and (d) have no basis in the statute.

#### b. Analysis

As this court explained in its summary judgment ruling,

> In 1965, the federal Medicaid program was created when Congress added Title XIX to the Social Security Act, 42 U.S.C. § 1396 *et seq.,* "for the purpose of providing federal financial assistance to states that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Although participation in the Medicaid program is entirely voluntary, once a state elects to participate, it must comply with federal statutory and regulatory requirements. *Id.* at 301, 100 S.Ct. at 2671; *Weaver v. Reagen,* 886

F.2d 194, 197 (8th Cir.1989) ("Although a state's participation [in the Medicaid program] is voluntary, once a state chooses to participate in the program it must comply with federal statutory and regulatory requirements."). Federal and state governments finance Medicaid programs jointly, but state governments actually administer the programs. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

Pursuant to Title XIX, participating states must provide financial assistance for medical services to the "categorically needy," which include the aged, blind, disabled, and needy individuals with dependent children. 42 U.S.C. § 1396a(a)(10)(A); *see Beal v. Doe,* 432 U.S. 438, 440 n. 1, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). Although not required to do so, participating Medicaid states may also opt to provide medical services to the "medically needy." 42 U.S.C. § 1396a(a)(10)(C); *see Beal,* 432 U.S. at 440 n. 1, 97 S.Ct. 2366. "Medically needy" individuals are those "who do not qualify for some forms of federal assistance but who nonetheless lack the resources to obtain adequate medical care." *Hodgson v. Board of County Com'rs, County of Hennepin,* 614 F.2d 601, 606 (8th Cir.1980). Iowa participates in the Medicaid program and provides services to both the categorically needy and the medically needy. "If a State elects to include the medically needy in its Medicaid plan, it has the option of providing somewhat different coverage from that required for the categorically needy." *Harris,* 448 U.S. at 301 n. 1, 100 S.Ct. 2671 (citation omitted).

*Smith,* 24 F.Supp.2d at 960 (footnote omitted). The categories of medical services that are available to "medically needy" individuals, at the option of the state, are specified in 42 U.S.C. § 1396a(a)(10)(C)(iv), and specifically defined in § 1396d(a). The parties do not dispute that Smith belongs to, and receives Medicaid services as, a "medically needy" individual. They also do not dispute that the general categories of medical services covered by the Iowa Medicaid program and provided to individuals in the medically needy coverage group include inpatient hospital services, physician's services, prescribed drugs, and prosthetic devices. Nor do they dispute that, but for an administrative regulation prohibiting coverage for such services, sex reassignment surgery would fall within the covered categories of services for medically needy individuals.

Section 1396a(a)(17) provides, in pertinent part, as follows:

> A State plan for medical assistance must—
>
> (17) ... include reasonable standards (which shall be comparable for all groups ...) for determining eligibility for and the extent of medical assistance under the plan which (a) are consistent with the objectives of this subchapter [1396a]. ...

42 U.S.C. § 1396a(a)(17). The regulation upon which the court relied as further defining the statutory right, 42 C.F.R. § 440.230, provides as follows:

> (a) The plan must specify the amount, duration, and scope of each service that it provides for—
>
> > (1) The categorically needy; and
> >
> > (2) Each covered group of medically needy.
>
> (b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.
>
> (c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.
>
> (d) The agency may place appropriate limits on a service based on such criteria

as medical necessity or on utilization control procedures.

42 C.F.R. § 440.230.

Numerous courts, including our own circuit court of appeals, have held that this subsection of the Medicaid statute, § 1396a(a)(17), and this regulation, 42 C.F.R. § 440.230, taken together, put boundaries on the discretion of the states to limit the *services* provided to "medically needy" persons if such states have decided to extend coverage to that category of persons. *See, e.g., Weaver v. Reagen*, 886 F.2d 194, 197–98 (8th Cir.1989) (noting the substantive limitations on determination of services to be covered in 42 C.F.R. § 440.230(a)–(d), and observing that, "[m]oreover, the state's plan for determining eligibility for medical assistance must be ' "reasonable" and "consistent with the objectives" of the Act.' *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (quoting 42 U.S.C. § 1396a(a)(17))."); *accord Planned Parenthood Affiliates of Mich. v. Engler*, 73 F.3d 634, 637 (6th Cir.1996) ("Although it is true that Title XIX requires only that the state exercise its discretion in creating a medical plan in a manner 'reasonable' and 'consistent with the objectives' of Medicaid, 42 U.S.C. § 1396a(a)(17) (1988); *Beal v. Doe*, 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977), a state 'may not arbitrarily deny or reduce the amount, duration, or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition.' 42 C.F.R. § 440.230(c) (1994). Abortions, as we discussed above, fall within several of Medicaid's mandatory categories of care. The question, then, is whether Section 109a discriminates in its coverage of abortions on the basis of a patient's diagnosis and condition."); *Hope Med. Group for Women v. Edwards*, 63 F.3d 418, 425 (5th Cir.1995) (after noting that "Title XIX specifically provides that participating states must establish 'reasonable standards' that are 'consistent with the objectives' of the Act,"

citing 42 U.S.C. § 1396a(a)(17), the court found that "HCFA regulations promulgated under Title XIX provide additional guidance in assessing the reasonableness of a state restriction on the medical services offered through its Medicaid program," citing 42 C.F.R. § 440.230, and concluding that "[a] participating state may, therefore, choose to limit the provision of particular medical procedures or treatments as long as the restriction complies with § 440.230."), *cert. denied sub nom. Foster v. Hope Med. Group for Women*, 517 U.S. 1104, 116 S.Ct. 1319, 134 L.Ed.2d 471 (1996); *Hern v. Beye*, 57 F.3d 906, 910–11 (10th Cir.) ("Second, Colorado's restriction violates 42 U.S.C. § 1396a(a)(17) because it is inconsistent with the basic objective of Title XIX—to provide qualified individuals with medically necessary care. The purpose of Medicaid as stated in the Act is to enable states to provide medical treatment to needy persons 'whose income and resources are insufficient to meet the cost of necessary medical services.' *Id.* § 1396 (emphasis added). This circuit, as well as several other courts, has interpreted Title XIX and its accompanying regulations [elsewhere specifying 42 C.F.R. § 440.230] as imposing a general obligation on states to fund those mandatory coverage services that are medically necessary. [Citing cases]."), *cert. denied sub nom. Weil v. Hern*, 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 494 (1995). Indeed, the Eighth Circuit Court of Appeals has specifically rejected the notion, resurrected by the Director here, that "section 1396a(a)(17) pertains solely to financial eligibility requirements and not to the scope of services," noting that the Supreme Court had also rejected that argument. *See Hodgson v. Board of County Comm'rs, County of Hennepin*, 614 F.2d 601, 609–10 (8th Cir. 1980) (citing *Beal*, 432 U.S. at 444, 97 S.Ct. 2366). In light of these authorities, the court finds no basis for retreating from its conclusion that an adequate legal basis for Smith's claim is found in 42 U.S.C.

§ 1396a(a)(17) and 42 C.F.R. § 440.230(b), (c), and (d).

### 2. Iowa's denial of coverage for sex reassignment surgery

■ The Director contends that, even if the court continues to hold that Smith's claim has a proper legal foundation in 42 U.S.C. § 1396a(a)(17) and 42 C.F.R. § 440.230(b), (c), and (d), Iowa's exclusion of sex reassignment surgery from coverage for "medically needy" persons is reasonable. This argument has two prongs: The Director argues that the process whereby Iowa decided to exclude coverage for this service was reasonable, and that the decision itself was proper, because sex reassignment surgery is merely "experimental," not generally accepted, as a treatment for gender identity disorder.

### a. The Pinneke decision

Iowa's current exclusion of coverage for sex reassignment surgery must be considered in the context of a decision of the Eighth Circuit Court of Appeals, *Pinneke v. Preisser*, 623 F.2d 546 (8th Cir.1980), now almost twenty years old, in which the court held that Iowa must cover sex reassignment surgery under its Medicaid program. In *Pinneke*, the appellants, state and local officials in charge of administering Iowa's Medicaid program, argued that Congress conferred upon the states considerable latitude and discretion in shaping their medical assistance programs under Title XIX, and that the State of Iowa had properly exercised this discretion to formulate an irrebuttable presumption that treatment of transsexualism (as it was then called) by alteration of healthy tissue cannot be considered "medically necessary." *Pinneke*, 623 F.2d at 548. The court, however, noted that "[f]rom this record, it appears that radical sex conversion surgery is the only medical treatment available to relieve or solve the problems of a true transsexual." *Id.* The court then quoted as supporting authority portions of the decision of the Minnesota Supreme Court in *Doe v. Minnesota Department of Public Welfare and Hennepin County Welfare Board*, 257 N.W.2d 816, 819 (Minn.1977), in which the state high court had reasoned that the only medical treatment known to be successful for treating adult transsexualism was sex reassignment surgery. *Pinneke*, 623 F.2d at 548–49.

The court in *Pinneke* found that the plaintiff was a "categorically needy" participant in Medicaid, and thus was entitled to services including inpatient hospital services and physicians' services. *Id.* at 549. The court then found that Iowa's provision of services was subject to 42 C.F.R. § 440.230(c), which, as noted above, bars a state's arbitrary denial or reduction in the amount, duration, or scope of services for which the Medicaid participant would otherwise be eligible " 'solely because of the diagnosis, type of illness, or condition,' " and that "a state plan absolutely excluding the only available treatment known at this stage of the art for a particular condition must be considered an arbitrary denial of benefits based solely on the 'diagnosis, type of illness, or condition.' " *Id.* (quoting 42 C.F.R. § 440.230(c)). The court also held that Iowa's irrebuttable exclusion of sex reassignment surgery was not consistent with the objectives of the Medicaid statute, and that it had been imposed without any formal rule-making proceedings or hearings, which the court believed reflected "inadequate solicitude for the applicant's diagnosed condition, the treatment prescribed by the applicant's physician, and the accumulated knowledge of the medical community." *Id.* The court then observed that the Supreme Court's decision in *Beal v. Doe*, 432 U.S. 438, 445 n. 9, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), and the legislative history of the Medicaid statute reflected judicial and congressional concern that medical judgments play a primary role in the determination of medical necessity. *Id.* In light of these authorities, the court stated, "The decision of whether or not certain treatments or a particular type of surgery is 'medically necessary'

rests with the individual recipient's physician and not with clerical personnel or government officials." *Id.* at 550. The court held that "Pinneke proved a real need for the only medical service available to alleviate her condition, and the record indicates her condition has improved since the surgery." *Id.* Therefore, the Eighth Circuit Court of Appeals upheld the district court's order that Iowa's Medicaid program was required to reimburse the plaintiff for the costs of her sex reassignment surgery. *Id.*

The Director argues that *Pinneke* is not only wrong, but not controlling, because more than a decade after *Pinneke* was decided, the IDHS redid its administrative rule-making process and through that process has promulgated a reasonable and appropriate rule to exclude sex reassignment surgery from Medicaid coverage. The Director justifies this rule on the ground that sex reassignment surgery is "experimental," other forms of treatment, including psychotherapy, are more appropriate for gender identity disorder, and provision of a wider range of services to a broader range of recipients is a more reasonable use of limited resources under the "conditions in [this] state," citing 42 U.S.C. § 1396. This court will address first the adequacy of the procedures Iowa used to rewrite its Medicaid regulations specifically to exclude coverage for sex reassignment surgery.

### b. Reasonableness of the rule promulgation process

As demonstrated in the Director's evidence and briefing, Iowa's renewed consideration of an exclusion for sex reassignment surgery arose after Iowa's Medicaid program paid for one recipient's sex reassignment surgery in 1991, as required by *Pinneke*. The reconsideration began with a literature review and review of services provided by other Medicaid programs conducted by the Iowa Foundation for Medical Care (IFMC) in 1993. IFMC is a peer review organization primarily responsible for monitoring the quality of care for the Medicare population in Iowa, Nebraska, and Illinois. It also provides other services under contract for Medicaid organizations in Iowa and Nebraska.

The specific questions the IFMC was directed to answer in its report on the definition, diagnosis, and treatment of "gender dysphoria" were the following:

- Is the surgical treatment considered effective?

- Is the surgery considered experimental or investigational for treatment of the condition?

- Is surgery considered the *only* effective treatment for the condition?

- Is there any controversy in the medical community regarding the efficacy or appropriateness of surgery? and

- Are there definitions of transsexualism and/or gender dysphoria used in the literature that do not depend on a person's "desire for surgery"?

Defendant's Trial Exh. I, at 2. Becky Heeman, the Vice President of Government Quality Improvement Programs at IFMC, who also held that position at the time its report on sex reassignment surgery and gender identity disorder was prepared for the Iowa Medicaid program, testified that IFMC conducted an objective, medically based review, without any understanding or direction from the IDHS that a particular result should be obtained.

The review was conducted and the initial report authored by a registered nurse. The record shows that this nurse had no specific training or experience in the treatment of gender identity disorder. The nurse, *inter alia*, conducted a literature review and contacted various private insurance entities, some state Medicaid programs, the National Institute of Mental Health, the University of Minnesota School of Medicine's Program in Human Sexuality, and the Harry Benjamin International Gender Dysphoria Association for information. *See* Defendant's Trial Exh. I, at 2–3. The nurse's draft report was then presented to a physician review committee.

That committee consisted of family physicians, general surgeons, and general internists. The committee did not include any psychiatrists, psychologists, or any members with experience in the treatment of gender identity disorder. The report, as approved by the committee, indicated that there was no consensus in the literature that sex reassignment surgery was an appropriate treatment for gender identity disorder, and that it appeared that other treatment options were available. Defendant's Trial Exh. I, at 18–19.

Following submission of the IFMC report, the IDHS promulgated a more formal survey of other state Medicaid agencies to determine which state Medicaid programs covered sex reassignment surgery. The results of this survey indicated that only eight states provided any Medicaid coverage for sex reassignment surgery, and of those eight, some required prior authorization. Defendant's Trial Exh. J.

The Department then promulgated a proposed rule excluding Medicaid coverage for sex reassignment surgery and subjected it to administrative rule-making proceedings, including public notice and comment, pursuant to Iowa Code Ch. 17A. The Department received only one response to the proposed rule, a negative one, from plaintiff's counsel in this case, who had also represented the individual who received Medicaid benefits for sex reassignment surgery in 1991. The lack of other comments was taken by the Department as supporting its conclusion that sex reassignment surgery is not generally accepted by the medical community. Apparently, the Department disregarded the much more obvious inference that very few individuals in the state of Iowa were likely to be directly affected by the proposed rule, such that they would offer comments. Prior to adoption, the new rule excluding coverage for sex reassignment surgery was also reviewed by the Joint Administrative Rules Review Committee of the Iowa general assembly, but that committee did not offer any objection. The administrative rule was duly adopted and consequently has the force and effect of law. *See, e.g., Hildreth v. Iowa Dep't of Human Servs.*, 550 N.W.2d 157, 160 (Iowa 1996).

However, the process whereby the new rule was promulgated is not insulated from attack, because the question is not whether proper procedures under Iowa law were followed to promulgate the administrative rule, but whether exclusion of coverage of sex reassignment surgery for medically needy individuals complies with Medicaid statutes and regulations. *Weaver*, 886 F.2d at 197–98; *Pinneke*, 623 F.2d at 548–49; *accord Planned Parenthood Affiliates of Mich.*, 73 F.3d at 637; *Hope Med. Group for Women*, 63 F.3d at 425; *Hern*, 57 F.3d at 910–11. The court finds that the process to promulgate the new rule here was not "reasonable," and hence did not result in a "reasonable" exclusion or one otherwise in compliance with the applicable Medicaid statute and regulations, because it failed to provide a reasonable foundation for the rule as promulgated.

First, as to the IFMC report, the most glaring failure in the process is that the IFMC failed to contact, as sources of pertinent information, or to involve, as decisionmakers or advisors, any persons with actual experience in the treatment of gender identity disorder.[7] Although Ms. Heeman testified that it was her understanding that the nurse who prepared the IFMC report had interviewed a psychiatrist at the University of Minnesota School of Medicine's Program in Human Sexuality who had treated or was involved in treating gender identity disorder, the IFMC report does not reflect that. It indicates only that the University of Minnesota School of Medicine's Program in Human Sexuality was a

7. The court does not consider it a failing that the nurse conducting the literature review lacked any personal experience or training in the treatment of gender identity disorder, because such experience or training was not necessary to preparation of an adequate literature review, although perhaps it would have been helpful.

"source" that was "contacted," *see* Defendant's Trial Exh. I, at 2, and nowhere in the report did the author indicate what, if any, information was obtained from that "source," or from whom in what capacity at the institution. Nor does the report reflect that the author was drawing upon information supplied firsthand by any other professional regularly involved in the treatment of gender identity disorder. The reporter's "contacts" with the Harry Benjamin International Gender Dysphoria Association, the American Psychiatric Association, and other institutions similarly fail to show that there was any consultation with practitioners actually involved in the treatment of gender identity disorder.

Second, even had the report reflected an adequate basis for its conclusions, the IFMC committee that adopted the report lacked the professional credentials to evaluate its conclusions: None of the members of that committee had any experience treating gender identity disorder, and in fact, none was a psychiatrist, psychologist, or other mental health professional, and none appears to have any particular training or experience treating gender issues. Again, this would not necessarily be a shortcoming if the committee had in any way shown that it understood it lacked an adequate basis for evaluating the report and had sought assistance from or consulted with, at a minimum, persons in the appropriate specialties, including psychiatry, or better yet the more specific subspecialty of treatment of gender identity disorder. This court has grave concerns about evaluation of the appropriateness of particular treatments for psychiatric disorders by family physicians, general surgeons, and general internists, just as it would have grave concerns about psychiatrists evaluating the efficacy of certain obstetric procedures or cancer treatments. These problems with the qualification of the review committee were in no way alleviated by the efforts of the IDHS to survey other state Medicaid programs before promulgating a rule excluding sex reassignment surgery from Medicaid coverage, because the Department also failed to involve in its portion of the process, as a source of information, a decision-maker, advisor, or consultant any person actively involved with or experienced in the treatment of gender identity disorder.

Third, the court concludes that the evaluative process used by the IDHS and its response to the IFMC report and its own survey were so inadequate as to indicate that the rule-making process was result-oriented. The questions the Department posed to the IFMC appear to have been designed, at least in some respects, specifically to rebut the conclusions of the Eighth Circuit Court of Appeals in *Pinneke*. For instance, the IFMC was asked to examine whether sex reassignment surgery was considered the only effective treatment for gender identity disorder, *see* Defendant's Trial Exh. I, at 2, which directly challenges the conclusion of the court in *Pinneke* that "[f]rom this record, it appears that radical sex conversion surgery is the only medical treatment available to relieve or solve the problems of a true transsexual." *Pinneke*, 623 F.2d at 548. The IFMC was *not* asked the objective question, "What are the effective treatments of gender identity disorder and when is each such treatment appropriate?" Attempting to correct a defect in its prior proof and rule-making process would not necessarily be inappropriate, if the Department responded appropriately to the new information gathered during its investigations and evaluations.

Another instance of result-oriented bias tainting the process is in the disparity between the information in the IFMC report and the rule promulgated. In *Pinneke*, the court recognized that the appropriateness of sex reassignment surgery depended upon whether the individual seeking the procedure was a "true transsexual." *Id.* Similarly, the discussion of particular treatment methods in the IFMC report consistently notes that the literature reflects that the degree of gender

dysphoria is determinative of or important to the evaluation of the appropriateness of particular treatments, including sex reassignment surgery, as is the age of the sufferer; that the effectiveness of various treatments should be considered as part of a multi-stage process that may or may not culminate in sex reassignment surgery; and that care should be used in the selection of candidates for final sex reassignment surgery. *See* Defendant's Trial Exh. I, at 8–15. However, the rule promulgated by the Department is instead a blanket exclusion of sex reassignment surgery as treatment for *any* gender identity disorder or psychological or psychiatric need. *See* IOWA ADMIN.CODE § 441–78.1(4)(b)(2) & (d)(2) (Defendant's Trial Exh. O). Thus, when the report did not present the precise result desired—a recommendation that sex reassignment surgery was not the only treatment for gender identity disorder—the rule was nonetheless promulgated as a blanket exclusion of coverage for sex reassignment surgery for any degree of gender identity disorder or any psychological or psychiatric need.

Similarly, when the report stopped short of describing sex reassignment surgery as "experimental," in addressing the second question posed to the reporter, the basis for the proposed rule was shifted to the "controversial" nature of the procedure. *See* Defendant's Trial Exh. I, at 2 & 18–19 (questions posed to IFMC and conclusions); *and compare* Defendant's Trial Exhs. H (proposed rule), L (Department's response to negative comment on proposed rule by plaintiff's counsel), & N (final proposed rule). It should be noted that Medicaid coverage may be excluded for "experimental" procedures, *see Miller v. Whitburn,* 10 F.3d 1315, 1318 (7th Cir. 1993) (there is an "established doctrine that a Medicaid-participating state is under no obligation to pay for experimental procedures."),[8] but nowhere is exclusion of

coverage authorized simply because a service or procedure is "controversial." Although this inadequacy was pointed out to the Department in the negative comment on the proposed rule from plaintiff's counsel, *see* Defendant's Trial Exh. K, the Department did not attempt to justify its conclusion on the basis of standards articulated in Medicaid law, but simply on the basis of its own belief that the "controversial" nature of the treatment was sufficient ground to deny coverage for sex reassignment surgery. Defendant's Trial Exh. L.

Thus, the process of promulgation of the Iowa rule excluding sex reassignment surgery from Medicaid coverage was not adequate or reasonable. Rather, it only went through the motions of rectifying one of the inadequacies noted in *Pinneke,* the lack of any formal rule-making process. *See Pinneke,* 623 F.2d at 549. The result of the renewed rule-making process appears to have been a foregone conclusion, the promulgation of a rule providing a blanket exclusion of coverage for sex reassignment surgery as a treatment for any psychological or psychiatric condition. Nodding at *Pinneke* cannot rectify the inadequacies identified in that decision in the promulgation of Iowa's rule excluding sex reassignment surgery from Medicaid coverage, and the Department did no more than nod.

### c. Reasonableness of the rule

The inadequacy of the process whereby the Iowa rule barring Medicaid coverage for sex reassignment surgery was promulgated directly undermines the reasonableness of the rule itself. However, the Director asserts that the rule is nonetheless sound, because sex reassignment surgery is "experimental," or not generally accepted in the medical community, and therefore is not something on which the Iowa Medicaid program should expend some of its limited resources. Smith argues, however, that sex reassignment surgery is not

---

**8.** The court will explore the prohibition on "experimental" treatments in more detail be-

low.

"experimental," but is instead recognized by persons actively involved in the treatment of gender identity disorder as the appropriate treatment for individuals with gender identity disorder to the degree Smith himself has that condition.

 **i. Medicaid coverage for "experimental" treatments.** The court agrees with the Director that Medicaid coverage may generally be excluded for "experimental" procedures. *See Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir.1993) (there is an "established doctrine that a Medicaid-participating state is under no obligation to pay for experimental procedures."); *Rush v. Parham*, 625 F.2d 1150, 1154–55 (5th Cir.1980) (same). The usual rationale for such an exclusion is that it complies with Medicaid statutes and regulations regarding "medical necessity" and "utilization control," such as 42 C.F.R. § 440.230(d), which specifically allows "appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." *See Hern*, 57 F.3d at 911 (a state could exclude experimental treatment that might otherwise be deemed medically necessary pursuant to a generally applicable funding restriction or utilization control procedure); *Miller*, 10 F.3d at 1318 (considering whether the definition of liver-bowel transplants as "experimental" complied with the requirement under 42 U.S.C. § 1396d(r)(5) to provide medically necessary treatment of conditions discovered by covered screening techniques). In *Weaver*, the Eighth Circuit Court of Appeals seemed to accept, at least for the sake of argument, the defendant's proposition that if use of a treatment is experimental, it can never be deemed medically necessary treatment, although the court rejected the defendant's assertion that the treatment in question— prescribing AZT for AIDS patients outside of the labeled indications for the drug—was "experimental." *Weaver*, 886 F.2d at 198. Similarly, in *Ellis v. Patterson*, 859 F.2d 52 (8th Cir.1988), the Eighth Circuit Court of Appeals concluded that

"experimental" treatments, even if they are the Medicaid recipient's only hope of survival, do not necessarily have to be covered by Medicaid:

> Allowing the states some discretion in the funding of medical procedures is, after all, consistent with the policy behind the Medicaid Act: federal appropriations are "[f]or the purpose of enabling each State, *as far as practicable under the conditions in such State*," to furnish medical assistance to the needy. 42 U.S.C. § 1396. Other limitations on medically necessary services, such as the number of physician visits, *Curtis v. Taylor*, 625 F.2d 645 (5th Cir.1980), or in-hospital days, *Charleston Memorial Hosp. v. Conrad*, 693 F.2d 324 (4th Cir. 1982), have been permitted as reasonable. And we think plaintiff's position that all organ transplants (including hearts and lungs) must be covered by Medicaid is unrealistic.

*Ellis*, 859 F.2d at 55 (emphasis in the original).

Courts, including the Eighth Circuit Court of Appeals, have struggled, however, with the definition of what constitutes an "experimental" procedure or treatment for which Medicaid coverage need not be provided, even if the treatment is "medically necessary." In *Ellis*, the court held as follows:

> Surely Congress did not intend to require the states to provide funds for exotic surgeries which, while they might be the individual patient's only hope for survival, would also have a small chance of success and carry an enormous price tag. Medicaid was not designed to fund risky, unproven procedures, but to provide the largest number of necessary medical services to the greatest number of needy people. Thus, we hold the State of Arkansas is not required to fund organ transplants under Medicaid, and that it may choose which kinds of organ transplants, if any, to cover.

*Ellis*, 859 F.2d at 55. Although this holding does state some standards, or at least

criteria to consider, perhaps more helpful than the rejection of "exotic surgeries" is the court's later adoption in *Weaver* of the definition of "experimental" for the purposes of Medicaid coverage articulated by the Fifth Circuit Court of Appeals:

> In *Rush v. Parham*, 625 F.2d 1150 (5th Cir.1980), the Fifth Circuit, in considering the "experimental" nature of treatment for purposes of Medicaid coverage, defined "experimental" as a treatment not "generally accepted by the professional medical community as an effective and proven treatment for the condition" or "rarely used, novel or relatively unknown." *Id.* at 1156 n. 11.

*Weaver*, 886 F.2d at 198–99. However, the court found that under this "*Rush* definition," [9] prescribing AZT for use beyond its labeled indications to treat AIDS patients was not experimental, because the use of AZT to treat AIDS patients who did not meet the labeled indications was generally accepted. *Id.* at 199.

More recently, the Seventh Circuit Court of Appeals has also embraced the "*Rush* definition" of "experimental," noting that "[c]learly, the best indicator that a procedure is experimental is its rejection by the professional medical community as an unproven treatment." *Miller*, 10 F.3d at 1320. However, the court in *Miller* added this caveat:

> The quoted passage [*Rush*, 625 F.2d at 1156 n. 11,] suggests, however, that different definitions of "experimental" may be necessary depending upon the notoriety of the treatment under review. Indeed, certain procedures may be so new

and, as a result, relatively unknown, that the medical community may not yet have formed an opinion as to their efficacy. We agree with the court in *Rush* that such procedures are not per se experimental. If "authoritative evidence" exists that attests to a procedure's safety and effectiveness, it is not "experimental."

*Miller*, 10 F.3d at 1320 (footnotes omitted). The court also discussed criteria for determining whether "safety" and "effectiveness" had been established:

> The safety of a new procedure may be determined by balancing its benefits against its attendant risks. *McLaughlin v. Williams*, 801 F.Supp. 633, 639 (S.D.Fla.1992) (citing Maxwell J. Mehlman, *Health Care Cost Containment and Medical Technology: A Critique of Waste Theory*, 36 Case W.Res.L.Rev. 778, 785 (1986)). The effectiveness of a procedure may be ascertained by considering such factors, among others, as: (1) the mortality of patients over the period in which the procedure has been performed; (2) how often it has been performed, and how successful it has been; (3) the reputation of the doctors and medical centers performing the procedure, and their record in related areas; (4) the long-term prognosis of patients who have had the procedure performed on them and (5) the extent to which medical science in related areas has developed rapidly. *Id.*

*Miller*, 10 F.3d at 1320 n. 11.

■ A counterpoint to the exclusion of Medicaid coverage for "experimental"

---

9. The "*Rush* definition," in its entirety, is as follows:

> The clearest articulation of the considerations that go into determining whether a particular service is experimental is found in a letter Medicare uses to explain to its clients and providers why a service is ineligible for reimbursement:
>
> In making such a decision (whether to provide payment for a particular service), a basic consideration is whether the service has come to be generally accepted by the professional medical community as an effective and proven treatment for the condi-

tion for which it is being used. If it is, Medicare may make payment. On the other hand, if the service or treatment is not yet generally accepted, is rarely used, novel or relatively unknown, then authoritative evidence must be obtained that it is safe and effective before Medicaid may make payment.

Enclosure # 2 to Intermediary Letters Nos. 77–4 & 77–5, (1976 Transfer Binder) Medicare & Medicaid Guide (CCH) P 28,152 (1976).

*Rush*, 625 F.2d at 1156 n. 11; *see also Miller*, 10 F.3d at 1320 (quoting *Rush* ).

treatments is the Eighth Circuit Court of Appeals' direction in *Pinneke* that, when a treatment is non-experimental, and is medically necessary, denial of coverage must comply with statutory and regulatory requirements to be permissible. *Pinneke*, 623 F.2d at 549 (citing the requirements of 42 C.F.R. § 440.230(c) and the objectives of Medicaid as limiting exclusion of medically necessary treatment); *accord Weaver*, 886 F.2d at 197 ("Although a state has considerable discretion in fashioning its Medicaid program, the discretion of the state is not unbridled," and must comply with regulations, such as 42 C.F.R. § 440.230(b), (c), and (d), and statutory requirements such as § 1396a(a)(17)); *see also Hern*, 57 F.3d at 911 ("It may be that, pursuant to a generally applicable funding restriction or utilization control procedure, a participating state could deny coverage for a service deemed medically necessary in a particular case. But a state law that categorically denies coverage for a specific, medically necessary procedure except in those rare instances when the patient's life is at stake is not a 'reasonable standard[ ] ... consistent with the objectives of [the Act],' 42 U.S.C. § 1396a(a)(17), but instead contravenes the purposes of Title XIX.") (internal citations omitted). Thus, under *Pinneke*, denial of non-experimental, medically necessary treatment may be considered an arbitrary denial of benefits based solely on the "diagnosis, type of illness, or condition," under 42 C.F.R. § 440.230(c), and is contrary to the objectives of Medicaid, if the exclusion relates to the "only available treatment known at this stage of the art for a particular condition." *Pinneke*, 623 F.2d at 549. Somewhat later, the Eighth Circuit Court of Appeals reiterated its conclusion in *Pinneke* that an "irrebuttable presumption" that a particular treatment can never be medically necessary is unreasonable, when that presumption is contrary to recognition by the medical community and scientific literature and excludes the only known treatment for an individual with a particular condition. *Weaver*, 886 F.2d at 199–200. Therefore, in *Weaver*, the court held that "pursuant to the objectives of the Act, Missouri Medicaid may not deny coverage of AZT to AIDS patients who are eligible for Medicaid and whose physicians have certified that AZT is medically necessary treatment." *Id.* at 200.

 ***ii. Defendant's evidence that sex reassignment surgery is experimental.*** In an effort to fulfill the promise that the defense would establish that sex reassignment surgery is experimental, the Director presented another survey, conducted in August and November of 1998, showing that only seven of the forty-seven states responding provide coverage for sex reassignment surgery, and the testimony of his expert, Dr. Randall Kavalier, a psychiatrist. The survey presents at best an inference that, because other Medicaid programs do not cover sex reassignment surgery, the procedure is either "experimental" or may properly be excluded on the basis of medical necessity or utilization control procedures, which is an exclusion permitted by 42 C.F.R. § 440.230(d), rather than simply an arbitrary denial of coverage based on "diagnosis, type of illness, or condition," which is proscribed by 42 C.F.R. § 440.230(c). The probative value of the survey is slight, however, because the basis for the exclusion of coverage for sex reassignment surgery in each state is not presented. The court is not persuaded by a "nobody else does, so we don't have to" argument, not least, because the states simply are not unanimous in their denial of Medicaid benefits for sex reassignment surgery.

Thus, the court turns to Dr. Kavalier's "expert" opinions. Dr. Kavalier has a general psychiatric practice, with somewhat greater emphasis on child and adolescent services, based on subspecialty training, but he sees all aspects of psychiatry from child and adolescent to geriatric. He encountered only one case of gender identity disorder during his training, some eight years ago, and he had only limited contact with that patient. He testified that the

basis for his opinions in this case were primarily a literature review conducted in preparation for his expert report, and his general knowledge of psychiatric principles based on his training and experience. Turning to the crux of the present issue, Dr. Kavalier testified, *inter alia*, that he believed sex reassignment surgery is "controversial," and more specifically, "poorly evolved, less than perfected, certainly not [a] curative procedure." Trial Transcript, Vol. I, p. 201, l. 8 & 16–17. He also testified that he opposed surgical treatment of psychiatric disorders and that he believes psychotherapy is a more appropriate treatment in all cases of gender identity disorder.

At trial, Smith moved to exclude Dr. Kavalier's testimony on the ground that Dr. Kavalier was not qualified to testify concerning the nature or effectiveness of sex reassignment surgery, nor was he qualified to testify as to the existence or non-existence of any diagnosis of gender identity disorder in Smith's case. The basis for Smith's motion was that Dr. Kavalier had been involved in only one instance of treatment of one patient with a similar, but not identical, diagnosis to that claimed by Smith, eight years earlier, and treatment of that individual occurred only over a very short period. Thus, Dr. Kavalier's opinions rested primarily on a literature review, but not on any connection between his practice and his opinions in this case, and consequently he had no specialized knowledge, education, experience, or training to bring to bear upon the issues in the case. The court heard Dr. Kavalier's testimony in this bench trial subject to Smith's objection.

The Supreme Court has recently considered the standards for admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and still more recently in *Kumho Tire Co., Ltd. v. Carmichael*, — U.S. —, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In *Kumho*

*Tire Company*, the court explained these standards:

In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." 509 U.S., at 589, 113 S.Ct. 2786 ....

We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U.S., at 590, 113 S.Ct. 2786. It "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.*, at 592, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ..., the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S., at 592, 113 S.Ct. 2786.

*Kumho Tire Co., Ltd.*, — U.S. at —, 119 S.Ct. at 1174–75. The Supreme Court concluded that the district court had properly applied the *Daubert* factors:

The District Court did not doubt Carlson's qualifications, which included a masters degree in mechanical engineering, 10 years' work at Michelin America, Inc., and testimony as a tire failure consultant in other tort cases. Rather, *it excluded the testimony because, despite those qualifications, it initially doubted, and then found unreliable, "the methodology employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis."* Civ. Action No. 93–0860–CB–S (S.D.Ala., June 5, 1996), App. to Pet. for Cert. 6c. After examining the transcript in "some detail," 923 F.Supp., at 1518–519, n. 4, and after considering respondents' defense of Carlson's methodology, the District Court determined that Carlson's testi-

mony was not reliable. It fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is "shaky." *Daubert*, 509 U.S., at 596, 113 S.Ct. 2786. In our view, the doubts that triggered the District Court's initial inquiry here were reasonable, as was the court's ultimate conclusion.

*Id.* at ——, 119 S.Ct. at 1176–77 (emphasis added).

Recent decisions of the Eighth Circuit Court of Appeals are in accord. The Eighth Circuit Court of Appeals, too, has made clear that "[i]t is the role of the district court to make certain that testimony admitted under Rule 702 'is not only relevant, but reliable.' " *Weisgram v. Marley Co.*, 169 F.3d 514, 517 (8th Cir.1999) (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). In *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076 (8th Cir.1999), the court noted,

> In *Daubert*, the Supreme Court determined that the *Frye* test, which required the exclusion of all scientific testimony not derived from generally accepted principles or theories, *see Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), had been superseded by Rule 702 of the Federal Rules of Evidence. *See Daubert*, 509 U.S. at 586, 588–89, 113 S.Ct. 2786. Rule 702 provides as follows:
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> In *Daubert*, the Court determined that, under Rule 702, "general acceptance" is no longer an absolute prerequisite to admissibility. 509 U.S. at 588–89, 113 S.Ct. 2786. However, the Court emphasized that trial courts must still screen proffered expert testimony for

relevance and reliability. Id. at 589, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469.

*Jaurequi*, 173 F.3d at 1081. Furthermore, the court explained,

> Of course, the *Daubert* reliability factors should only be relied upon to the extent that they are relevant, *see Pestel [v. Vermeer Mfg. Co.]*, 64 F.3d [382,] 384 [(8th Cir.1995)], and the district court must customize its inquiry to fit the facts of each particular case, *see Daubert*, 509 U.S. at 594, 113 S.Ct. 2786 ("the inquiry envisioned by Rule 702 is, we emphasize, a flexible one.") (footnote omitted). In short, although
>
>> [n]ot every guidepost outlined in *Daubert* will necessarily apply to expert testimony based on engineering principles and practical experience, ... the district court's "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" is no less important. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990–91 (5th Cir.1997) (quoting *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786); *accord Cummins v. Lyle Industries*, 93 F.3d 362, 367 n. 2 (7th Cir.1996).

*Jaurequi*, 173 F.3d at 1083.

Although the court heard Dr. Kavalier's testimony subject to Smith's objection, the court now finds that Dr. Kavalier was not qualified to testify to issues in this case beyond general principles of psychiatry and his most basic opinions about the diagnostic criteria stated in the DSM–IV, and then only to the extent such opinions were founded on general principles of psychiatry, and that any testimony he offered beyond these limitations was simply not reliable. *Kumho Tire Co., Ltd.*, —— U.S. at ——, 119 S.Ct. at 1174–75 ("Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony ... is

not only relevant, but reliable.' ") (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). Both the Eighth Circuit Court of Appeals and the Supreme Court have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that area of expertise, or that are not founded on a reliable methodology. *See, e.g., Kumho Tire Co., Ltd.,* —— U.S. at ——, 119 S.Ct. at 1176–77 (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); *Weisgram*, 169 F.3d at 518 (a city fire captain, although qualified as an expert on fire investigation, and therefore qualified to testify as to his opinion that a fire started in the entryway and radiated to a sofa, was not qualified to testify to his unsubstantiated theories of a malfunction that might have caused the fire); *Robertson v. Norton Co.,* 148 F.3d 905, 907 (8th Cir.1998) (an expert was "undoubtedly qualified to testify about a manufacturing defect in an exploding ceramic grinding wheel, [but] that did not qualify him as an expert on grinding wheel warnings," because he had never designed a warning for such a product, and his knowledge of ceramics would not provide the expertise on questions relevant to the adequacy of a warning, nor was it supported by any kind of scientific theory, practical knowledge or experience, or empirical research and testing). The appellate court has also questioned whether a psychiatrist with one specialty may properly provide expert testimony involving another psychiatric specialty. *See Castro v. Oklahoma,* 71 F.3d 1502, 1515 (10th Cir.1995) ("We believe a serious question whether Dr. Hamilton was competent to provide expert psychiatric assistance exists. Dr. Hamilton's specialties in child and geriatric psychiatry probably render him unqualified to offer an expert opinion on many of the issues raised in a capital murder trial. A forensic psychiatrist or psychologist is the proper specialist for such a task.").

Customizing its inquiry to fit the facts and issues in this case, *see Daubert,* 509 U.S. at 594, 113 S.Ct. 2786; *Jaurequi,* 173 F.3d at 1083, the court has reached the following conclusions concerning the reliability of Dr. Kavalier's opinions. Although Dr. Kavalier plainly has adequate education, training, and experience in general psychiatry to render opinions based on general psychiatric principles, just as plainly he lacks any first-hand "knowledge, skill, experience, training, or education" in the treatment of gender identity disorder, and thus lacks any qualification to render an opinion on diagnosis or treatment of that disorder. FED.R.EVID. 702; *Jaurequi,* 173 F.3d at 1081. In other words, Dr. Kavalier's testimony lacks " 'a reliable basis in the knowledge and experience of [the relevant] discipline,' " which is not just general psychiatry, but the diagnosis and treatment of gender identity disorder. *Kumho Tire Co., Ltd.,* —— U.S. at ——, 119 S.Ct. at 1175. Because the court finds that Dr. Kavalier lacks any appropriate knowledge or experience, the court cannot find that his evidence has a valid connection to the pertinent inquiry, the diagnosis and treatment of gender identity disorder. *See id.* (evidentiary reliability of expert testimony " 'requires a valid ... connection to the pertinent inquiry as a precondition to admissibility' ") (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

Dr. Kavalier's lack of qualification from training or experience on issues beyond general psychiatric principles is not removed by his literature review concerning gender identity disorder and sex reassignment surgery in preparation to render his opinion in this litigation. His literature review was his only real contact with the field of diagnosis and treatment of gender identity disorder. Such a literature review, however, is an insufficient basis or methodology on which to render a reliable expert opinion. Courts are suspicious of purported expertise premised solely or primarily on a literature review. *See, e.g., United States v. Paul,* 175 F.3d 906, 912 (11th Cir.1999) (the district court properly

excluded "expert" testimony on handwriting analysis, because the proffered expert had no skill, experience, training, or education in the field of handwriting analysis, and his law degree provided no such qualification, even though he had reviewed the literature in the field of questioned document examinations and then coauthored a law review article critical of forensic document examiners' ability to reach the correct conclusion in questioned document examinations); *Burton v. Danek Med., Inc.,* 1999 WL 118020, *3–4 (E.D.Pa. Mar. 1, 1999) (a proffered expert, a board certified neurologist, was not qualified to testify as an expert as to spinal fusion surgery, because he had never performed surgery of any kind, had no training in, nor had he ever observed any, spinal fusion surgery, had never treated a patient who had spinal fusion surgery, was not familiar with the techniques of such surgery, had conducted no independent research regarding spinal fusion surgery, and had only reviewed the medical literature supplied by the hiring party's counsel); *Mancuso v. Consolidated Edison Co. of N.Y.,* 967 F.Supp. 1437 (S.D.N.Y.1997) (rejecting the qualifications of a proffered "expert" concerning PCB exposure, although he was a medical doctor, because he had no experience with toxic torts and his "self-education" in the effects of PCBs was either insufficient or belied by his lack of knowledge under cross-examination); *Diaz v. Johnson Matthey, Inc.,* 893 F.Supp. 358, 372–73 (D.N.J. 1995) (disqualifying a pulmonologist from testifying that the plaintiff had a platinum allergy, because the witness was not an epidemiologist or a toxicologist, had "no other qualifications other than his medical education and his years practicing as a pulmonologist," had only casually studied the literature on platinum allergy, and had never previously treated a patient suffering from platinum allergy); *Wade–Greaux v. Whitehall Labs., Inc.,* 874 F.Supp. 1441, 1476 (D.Vi.) (a witness educated as a pediatrician, pharmacologist, and toxicologist was not qualified to testify regarding the cause of birth defects, because he had

merely reviewed selected literature on the subject for the purposes of litigation), *aff'd without op.,* 46 F.3d 1120 (3d Cir.1994). This court is particularly suspicious here of the reliability of any opinions based on Dr. Kavalier's literature review, because the court found it troubling that Dr. Kavalier based his belief that certain articles on gender identity disorder were reliable on a medical librarian's statement that articles on Medline were generally reliable.

Thus, the factual basis, data, principles, methods, and their application upon which Dr. Kavalier relied are sufficiently called into question that they cannot form a reliable basis in the knowledge and experience of the relevant discipline. *Cf. Kumho Tire Co., Ltd.,* —— U.S. at ——, 119 S.Ct. at 1175 (citing *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786). Consequently, Dr. Kavalier's opinions, beyond application of general psychiatric principles, do not meet the standards for admissibility under Rule 702.

Nor do Dr. Kavalier's examinations of plaintiff Smith change matters. Although those examinations provided an opportunity for firsthand observation, they nonetheless are sufficiently unreliable to carry much weight, even assuming the results would be admissible. Again, Dr. Kavalier had no previous experience with the diagnosis or treatment of gender identity disorder beyond a single instance, of short duration, some eight years before. Dr. Kavalier met with Smith only on two occasions and consequently never established the sort of treatment relationship he himself testified was essential to provide a reasonable basis for evaluating Smith's condition—that is, a relationship based on several meetings over a considerable period of time. When Dr. Kavalier reviewed Smith's medical records, he did so in preparation for litigation with the goal of his evaluation at least implicit. Although it is often the case that a defendant's medical or psychiatric expert is only allowed one or two opportunities to examine the plaintiff, and only reviews the medical records in preparation for litigation, Dr. Kavalier's

lack of other qualifications in the field of gender identity disorder diagnosis and treatment seriously undermines any likelihood that his evaluation would be an objective one based on accumulated knowledge and experience. The circumstances here seriously undercut Dr. Kavalier's own assertion that Smith's expert's evaluation was a result-oriented or treater-dictated diagnosis.

Even to the extent Dr. Kavalier's evaluation of Smith might otherwise have some indicia of reliability, because he is an experienced psychiatrist, his conclusions in this case simply are not as credible as those of Smith's expert, who has treated Smith for many years and is undoubtedly a qualified expert in the field of diagnosis and treatment of gender identity disorder.[10] In *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.,* 125 F.3d 1176 (8th Cir.1997), the Eighth Circuit Court of Appeals wrote,

> The plaintiffs argue[d] ... that [defendant's expert] should not have been allowed to testify because his opinion was "pure speculation and totally lacked foundation." This argument goes to the weight rather than the admissibility of the expert's testimony. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hose v. Chicago Northwestern Transportation Co.,* 70 F.3d 968, 974 (8th Cir.1995) (citing *Loudermill v. Dow Chemical Co.,*

863 F.2d 566, 570 (8th Cir.1988)). Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine. *Fox v. Dannenberg,* 906 F.2d 1253, 1256 (8th Cir.1990). "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hose,* 70 F.3d at 974.

*Arkwright Mut. Ins. Co.,* 125 F.3d at 1182–83. There appears to be some tension between this statement and the decree of the Supreme Court in *Daubert* and *Kumho Tire Company* that the district court must specifically evaluate the "factual basis" of expert testimony and determine whether it is sufficiently reliable to be admissible. *See Kumho Tire Co., Ltd.,* —— U.S. at ——, 119 S.Ct. at 1175; *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Nonetheless, to the extent the factual basis of Dr. Kavalier's testimony goes to its weight rather than its admissibility, Dr. Kavalier's reliance on a literature review and his lack of any significant training or experience in the diagnosis or treatment of gender identity disorder provide sufficient basis for this court, as the trier of fact, to discount the credibility of his testimony that sex reassignment surgery is not an appropriate treatment for gender identity disorder in general, or for this plaintiff in particular. Moreover, Dr. Kavalier, by virtue of applicable credibility factors and the substance of his testimony,[11] appeared to this court as the trier of fact much more like a hired

---

10. Indeed, Dr. Satterfield testified that Dr. Kavalier's diagnoses of Smith were typical of someone unfamiliar with gender identity disorder.

11. The court has utilized the following factors in assessing the credibility of Dr. Kavalier and other witnesses who testified in this matter, to the extent these factors are pertinent to a particular witness's testimony: (1) the interest of the witness in the result of the hearing; (2) the witness's relation to any party in interest; (3) the witness's demeanor upon the witness stand; (4) the witness's manner of testifying; (5) the witness's tendency to speak truthfully or falsely, including the probability or im-

probability of the testimony given his or her situation to see and observe; (6) the witness's apparent capacity and willingness to tell truthfully and accurately what he or she saw and observed; and (7) whether the witness's testimony is supported or contradicted by other evidence in the case. *See United States v. Phillips,* 522 F.2d 388, 391 (8th Cir.1975); *see also United States v. Merrival,* 600 F.2d 717, 719 (8th Cir.1979); *Clark v. United States,* 391 F.2d 57, 60 (8th Cir.), *cert. denied,* 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT 3.03 (1998).

advocate for the positions he espoused than a neutral, independent professional making an objective psychiatric evaluation.

■ *iii. Other evidence.* On the other side of the issue, the court was primarily presented with the testimony of Smith's expert, Dr. Sharon Satterfield, an associate professor in the University of Minnesota Medical School and a psychiatrist in the Department of Family Practice. Dr. Satterfield treated her first case of "transsexualism" in 1972, and over the last twenty-seven years has treated over a thousand individuals with some degree of gender identity disorder or gender dysphoria. She currently sees over one hundred patients who are gender dysphoric, which is approximately fifty to sixty percent of her caseload. She has also been involved in various studies of gender identity disorder and the effectiveness of treatments for it, including sex reassignment surgery.

Although Dr. Satterfield acknowledged that sex reassignment surgery is "controversial" and that there is some lack of consensus in the literature on its effectiveness, she opined that only one form of sex reassignment surgery is "experimental," and that is surgical or hormonal reassignment of children in their early teens, a procedure not currently being done anywhere in the United States. She agreed that psychotherapy can be effective to reverse gender dysphoria in children and even in adults who were not highly gender dysphoric. However, for extreme and irreversible cases of gender identity disorder—cases in which psychotherapy does not work—she testified that the only appropriate treatment remains sex reassignment surgery. *See, e.g.,* Deposition of Dr. Satterfield, p. 55, ll. 19–20; p. 89, ll. 7–21. (Plaintiff's Trial Exh. 3). She carefully limited this assertion, however, by stating that sex reassignment surgery is only appropriate after careful adherence to the diagnostic and treatment standards of the DSM–IV and the Harry Benjamin International Gender Dysphoria Association. She asserted that sex reassignment surgery is generally accepted in the medical community, in part because the surgery is conducted in general medical facilities, although they may be few in number, not strictly in research centers.

Dr. Satterfield testified that, in general, she does not consider surgery to be an appropriate treatment for psychiatric disorders. However, she testified that she believes the lack of consensus in the literature as to the appropriate of sex reassignment surgery for irreversible cases of gender identity disorder involves many issues, including personal beliefs, that have little to do with the medical or psychiatric appropriateness of sex reassignment surgery as a treatment for gender identity disorder. Furthermore, she testified that if you look at people actively involved in the treatment of gender identity disorder, there is a clear consensus that sex reassignment surgery is the only appropriate treatment for irreversible cases of adult gender identity disorder. Finally, Dr. Satterfield testified that sex reassignment surgery in a very high percentage of cases improves the quality of life of deeply gender dysphoric people and that the improvement seems to increase over time after the surgery as the recipient continues to adjust.

Based on the evidence presented at trial, the court concludes that sex reassignment surgery is not an "experimental" treatment for extreme cases of adult gender identity disorder. Rather, such treatment, although relatively rare as compared to the general population, is "generally accepted by the professional medical community as an effective and proven treatment" for extreme cases of gender identity disorder. *See Weaver,* 886 F.2d at 198–99; *Miller,* 10 F.3d at 1320. There is no clear "rejection" of the treatment for appropriate cases; rather, the controversy in the medical community, as even the IFMC report indicated, seems to focus on determination of which cases of gender identity disorder are appropriate for sex reassignment surgery. Here too, there are appro-

priate screening standards adhered to by the subspecialty of practitioners devoted to treating gender identity disorder, the HARRY BENJAMIN STANDARDS. Although sex reassignment surgery may be relatively unknown, at least *outside* of the community of professionals actively involved in treatment of gender identity disorder, there is sufficient "authoritative evidence" that sex reassignment surgery is both safe and effective as a treatment for extreme cases of gender identity disorder which do not respond to psychotherapy or other treatment. *See Miller,* 10 F.3d at 1320. The safety of the procedure is borne out by the lack of evidence of serious risks or complications as compared to the psychiatric benefits obtained. *See id.* at 1320 n. 11. The procedure is also "effective," in that no evidence was presented of a mortality rate exceeding the general population; the procedure has been performed with a high degree of medical *and psychiatric* success; the doctors performing the procedure have professional reputations and are performing the surgeries in general medical centers; the long-term prognosis of patients who have had the procedure performed on them is good, and in fact the follow-up data suggest that such patients' prognosis is likely to show increasing benefits over time; and finally, the techniques of the procedure are, if anything, improving the medical, and hence psychiatric, results. *See id.* (factors for evaluating safety and effectiveness).

In contrast to the transplant procedures considered in *Ellis,* 859 F.2d at 55, sex reassignment surgery is "exotic" only to the extent that it is unusual in the general population, but not in the sense that it is unusual or unorthodox for the treatment of the condition in question. Nor can it be said that sex reassignment surgery is a procedure with "a small chance of success [that] carr[ies] an enormous price tag," such that it is too "risky" or "unproven" to qualify for Medicaid coverage. *Ellis,* 859 F.2d at 55. Rather, the procedure is neither so expensive, nor so expensive in comparison to the benefits obtained, nor risky

to the individual that Medicaid resources would necessarily be poorly expended upon it.

Smith has proved that sex reassignment surgery is not so "experimental" that it should be subject to an irrebuttable presumption that it is not medically necessary. Contrary to his assertion at trial, the Director has failed to prove that sex reassignment surgery is "experimental," and any "controversy" about the procedure is not an adequate basis to preclude Medicaid funding. The Director spent a good deal of time at trial attempting to establish that Medicaid resources are better spent on other treatments that would affect a broader number of recipients, which was coupled with his assertion that, if the bar fell, based on the number of potential gender identity disorder cases in Iowa, Iowa's Medicaid program might have to pay for as many as three sex reassignment surgery procedures a year. However, even the Director's witnesses and counsel had to retreat from this position when they were reminded that those persons receiving sex reassignment surgery in one year would not need the treatment again in subsequent years. Furthermore, the Director's dire assertions of a flood of sex reassignment surgery cases is belied by the fact that, in the fifteen years after the *Pinneke* decision required Iowa's Medicaid program to pay for sex reassignment surgery, there were only two claims for payment for such procedures: one by the plaintiff in *Pinneke,* and one in 1991. It seems likely to the court that more money was spent out of Medicaid's "limited resources" attempting to *prevent* payment for sex reassignment surgery than would have been spent paying claims for such procedures during the same period of time.

Thus, the court concludes that sex reassignment surgery cannot be excluded from Medicaid coverage on the ground that it is "experimental." Rather, the exclusion here is not "reasonable," *see* 42 U.S.C. § 1396a(a)(17), nor based on either "medi-

cal necessity or on utilization control procedures" properly determined, *see* 42 C.F.R. § 440.230(d), but is instead an improper exclusion based on "diagnosis, type of illness, or condition," *see* 42 C.F.R. § 440.230(c), that prevents provision of services "sufficient in amount, duration, and scope to reasonably achieve" the purposes of inpatient and physician services otherwise provided. *See* 42 C.F.R. § 440.230(b).

Therefore, the court turns to the remaining questions, which are whether sex reassignment surgery is medically necessary in Smith's case, and whether he is in fact "ready" for the procedure.

### 3. Is sex reassignment surgery "medically necessary" for Smith?

■ After properly discounting the testimony of the Director's expert as unreliable and not credible, the court finds that the evidence presented at trial clearly establishes that sex reassignment surgery is "medically necessary" for Smith. First, the court finds that Smith has a deep-seated gender identity disorder. Specifically, the court finds that Smith meets all of the diagnostic criteria for gender identity disorder in an adult stated in the DSM–IV, which are set out *supra*, in footnote 5. The symptoms of that disorder have persisted since childhood; since Smith reached adulthood, the disorder has not responded to other treatment. To the extent Dr. Kavalier or the Director suggested that Smith has or may have other conditions instead of gender identity disorder, the court simply does not find their evidence to be credible.

Furthermore, as in *Weaver* and *Pinneke*, Smith's treating psychiatrist has certified that sex reassignment surgery is "medically necessary" treatment for Smith. *See Weaver*, 886 F.2d at 200 ("pursuant to the objectives of the Act, Missouri Medicaid may not deny coverage for AZT to AIDS patients who are eligible for Medicaid and whose physicians have certified that AZT is medically necessary treat-

ment"). The Director has failed to challenge successfully the credibility or appropriateness of Dr. Satterfield's diagnosis of either Smith's condition or her assessment of the appropriateness of sex reassignment surgery as treatment for that condition. Therefore, the court finds that sex reassignment surgery is "medically necessary" for Smith's gender identity disorder.

### 4. Is Smith "ready" for the final stage of sex reassignment surgery?

Finally, the court turns to something of a reprise of an issue considered in its disposition of the Director's motion to dismiss for lack of subject matter jurisdiction, whether Smith is "ready" for the final stage of sex reassignment surgery, a phalloplasty. During trial, the Director relied heavily on Dr. Kavalier's diagnosis of other psychiatric disorders that should be stabilized prior to sex reassignment surgery or that might preclude such surgery entirely. The Director also made much of Dr. Satterfield's reluctance to certify that Smith was ready immediately for sex reassignment surgery and since trial has attempted to undermine her assertion that Smith is now ready by pointing out supposed differences between her trial testimony concerning what steps remained before she would be satisfied that Smith was ready, and what steps actually occurred before Dr. Satterfield actually made such a certification.

The court concludes that Dr. Kavalier's diagnosis of contraindications to surgery simply is not as credible as the diagnosis of Smith's own psychiatrist, Dr. Satterfield, who has seen Smith over a very extended period of time. At trial, Dr. Satterfield testified that, although she did not agree with Dr. Kavalier's diagnosis of the plaintiff, there were things that she believed it would be appropriate to do in light of Dr. Kavalier's concerns before certifying Smith as ready for sex reassignment surgery. She suggested that she might like to try some of the newer antidepressants to see if Smith had the same

intolerance to them that he has had to other medications, although she testified that use of such medications was more in the interest of preparing Smith for sex reassignment surgery than as an alternative to it. She also testified that she would like to see Smith a few more times and perhaps conduct some further psychological testing. However, in her supplemental deposition, Dr. Satterfield testified that, having seen Smith twice since trial, she was convinced that Smith did not meet the diagnostic criteria for the conditions Dr. Kavalier opined that he had, and that there was really nothing more she felt should be done before certifying Smith as ready for sex reassignment surgery.

The court finds credible Dr. Satterfield's criterion by criterion rebuttal of Dr. Kavalier's diagnoses of schizo-affective disorder and borderline personality disorder and her conclusion that there are no psychotic disorders that would stand as impediments to completion of Smith's sex reassignment surgery. The record also shows that, after trial, Dr. Satterfield did explore with Smith whether they should attempt to use some new medications, but that they concluded that such medications likely would not be helpful. The court also finds persuasive Dr. Satterfield's testimony that, in her opinion, the Harry Benjamin standards for sex reassignment surgery have been satisfied in this case, and so finds.

Upon the record in this case, the court finds that Smith is indeed "ready" for completion of his sex reassignment surgery.[12]

### III. CONCLUSION

The Director's motion to dismiss for lack of subject matter jurisdiction will be denied, because this matter is ripe for adjudication and Smith has standing to assert it—and the requirements of standing and ripeness have been satisfied throughout the litigation. As to the merits of the cause of action, the court reiterates its conclusion that Smith has a sufficient legal basis for his claim in 42 U.S.C. § 1396a(a)(17), and applicable regulations including 42 C.F.R. § 440.230(b), (c), and (d). Next, the court finds that Iowa's rule excluding Medicaid coverage for sex reassignment surgery was neither reasonably promulgated nor substantively "reasonable," because the process to promulgate the rule was flawed and the result was contrary to available evidence. Specifically, the court finds that sex reassignment surgery is not "experimental" treatment for extreme cases of sex reassignment surgery, and that the resources that would have to be committed to sex reassignment surgery do not justify its exclusion from coverage. Thus, the court concludes that the exclusion here is not "reasonable," see 42 U.S.C. § 1396a(a)(17), nor based on either "medical necessity or on utilization control procedures" properly determined, see 42 C.F.R. § 440.230(d), but is instead an improper exclusion based on "diagnosis, type of illness, or condition," see 42 C.F.R. § 440.230(c), that prevents provision of services "sufficient in amount, duration, and scope to reasonably achieve" the purposes of inpatient and physician services otherwise provided. See 42 C.F.R. § 440.230(b). Finally, the court finds that sex reassignment surgery is "medically necessary" for Smith and that he is now "ready" for the final stage procedures.

Consequently,

1. The Director's December 30, 1998, motion to dismiss for lack of subject matter jurisdiction is **denied.**

2. The court **finds and declares** that defendant's policy of denying Medicaid

---

**12.** The court has considered the Director's supplemental authorities, but finds them inapposite to any question presented here. Whether prisoners are entitled to sex reassignment surgery under Eighth Amendment standards simply is not relevant to whether the plaintiff is entitled to coverage of sex reassignment surgery under Medicaid standards. Nor are the coverage of sex reassignment surgery under private insurance plans, which are entirely dependent on the language of the pertinent policy, federal Medicare standards, or decisions premised on preemption of state law, relevant here.

payment for sex reassignment surgery is in violation of applicable Medicaid statutes and regulations.

3. Defendant is **permanently enjoined** from denying Medicaid payment for costs associated with plaintiff's remaining stages of sex reassignment surgery.

4. Plaintiff shall submit claims for attorneys fees and costs as provided by N.D.La.L.R. 54.1 and 54.2.

**IT IS SO ORDERED.**